FIRST DISTRICT
SIXTH DIVISION
FEBRUARY 10, 2011

No. 1-09-2863

|  |  |  |
|---|---|---|
| | ) | |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 22606 |
| | ) | |
| MICHAEL LACY, | ) | Honorable |
| | ) | Douglas J. Simpson, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

JUSTICE ROBERT E. GORDON delivered the judgment of the court, with opinion. Justices Cahill and McBride concurred in the judgment and opinion.

## OPINION

Following a jury trial, defendant Michael Lacy was convicted of aggravated criminal sexual assault and two counts of armed robbery. Judgment was entered on the verdict, and defendant was sentenced to 25 years' imprisonment. Defendant's conviction was upheld on appeal (*People v. Lacy*, No. 1-05-2137 (2007) (unpublished order under Supreme Court Rule 23)), and defendant filed a petition for postconviction relief in which he claimed ineffective assistance of counsel. The postconviction petition was dismissed at the second stage of the proceedings, and defendant appeals. We affirm.

## BACKGROUND

Defendant's arguments on appeal are focused on trial counsel's examination of a witness both during a hearing on defendant's motion to suppress and at trial. Defendant challenges counsel's examination of the witness during the suppression hearing and counsel's failure to use the pretrial testimony to impeach the witness' trial testimony. The two accounts are not identical

and accordingly, we set out the witness' testimony during each proceeding in detail.

Defendant was arrested and charged in connection with an incident occurring on August 6, 2001, in Eastgate Park in Park Forest, during which three men threatened two victims with a gun, took the victims' property, and forced the female victim to perform oral sex on two of the men. Defendant and his two codefendants, Antonio Hale and Maurice Shelton, were charged with and indicted on 12 charges, including aggravated criminal sexual assault (720 ILCS 5/12-14(a)(4) (West 2000)) and armed robbery (720 ILCS 18-2(a)(2) (West 2000)). Defendant filed a petition for severance of his case from that of his codefendants, which was granted.

*Motion to Suppress*

Defendant filed a motion to suppress certain identification testimony of the State's witnesses. In the motion, defendant claimed that the two victims, T.D. and Dorwin Vines, identified defendant in a photo array after viewing a police lineup in which they were unable to identify defendant. Defendant also claimed that he was the only person who was both in the photo array and the lineup and that he was the only man in either who was a light-complexioned African-American male. From the "grossly suggestive nature of the pre-trial confrontation," as well as from the circumstances surrounding the incident and the "vague description" of the offenders given to police by the witnesses, defendant requested that any pretrial and in-court identification of defendant be excluded.

A hearing on the motion was held on November 18, 2004. In its opening statement, the State indicated that several of defendant's claims in the motion were factually incorrect. First, the State denied defendant's claims that T.D. viewed the photo array after the lineup but said that

defendant was identified in the photo array prior to the lineup. The State also indicated that T.D. identified defendant both in the photo array and in the lineup, and that one of the codefendants was also present in both the photo array and the lineup.

Defendant called Park Forest police officer Padilla as his first witness. Officer Padilla, an officer in the K-9 unit of the patrol division, testified that on the evening of August 6, 2001, he and two other officers responded to a call concerning a potential aggravated criminal sexual assault that had occurred in Eastgate Park. Officer Padilla went to the home of Vines, who had telephoned the police. Vines told Officer Padilla that three people had been involved in the incident and described them as being in their late teens, all wearing black, hooded sweatshirts and dark pants; the only physical characteristics provided were gender, race, and clothing.

Officer Padilla further testified that he went to Eastgate Park that evening. He described himself as "pretty familiar" with the park, having been a Park Forest police officer for 25 years, and indicated that the park was a small park approximately a block from railroad tracks. He testified that at the time Vines indicated that the incident occurred, it was dark outside, and opined that the park was not well lit.

Defendant also called T.D., the female victim, as a witness. She testified that on August 6, 2001, she was walking through Eastgate Park with Vines at approximately 9 or 9:30 p.m., when three unfamiliar men came up to them. T.D. said that two of the men were wearing hooded sweatshirts and the third was not. T.D. did not see where the men came from and was surprised by their presence. The men asked her and Vines if they smoked "weed"; they replied that they did not and kept walking. At that time, T.D. saw the men only briefly and did not pay any attention

to them. After T.D. and Vines had gone a few feet, T.D. heard the men ask whether they should "get them," after which they came up to her and Vines, pointed a gun, and demanded her purse. T.D. testified that she was startled and scared when she saw the gun.

T.D. further testified that they took her purse and Vines' watch and then, while she and Vines were standing next to each other, the men patted both of them down to see if they had anything else. The men told Vines to lie down on the ground; T.D. testified that one man went to Vines, while the other two stayed with her. They then told T.D. to remove all of her clothing; T.D. described the two men's positions as standing "at ten and two o'clock" in relation to her position. T.D. was upset and began crying. When asked how long the incident lasted, T.D. could not remember, but said that "[i]t felt like a long time. Like 10 minutes, maybe 15 minutes." She testified that Hale sat on a bench with her and she performed oral sex on him, after which defendant came over and forced her to perform oral sex on him; she then was forced to perform oral sex on Hale again. T.D. confirmed that this occasion was the first time she had seen any of the men, but testified that she was able to see the faces of the men well, and saw defendant's face for approximately three to four minutes while she was "doing him."

T.D. testified that the incident occurred a few feet from two benches in the park. When asked whether there were lights near the benches, T.D. replied:

> "WITNESS: It was a light over the bench.
>
> DEFENSE COUNSEL: Over the bench?
>
> WITNESS: Yeah, like over part."

On cross-examination, the State also asked about the lighting in the area:

4

"PROSECUTOR: [W]hen you were in the park, it was night time but you said there was lighting over the bench; is that correct?

WITNESS: Yes.

PROSECUTOR: Is that the bench you were made to sit on beginning with Antonio Hale?

WITNESS: Yes.

PROSECUTOR: Did that light shine right down upon where you were sitting?

WITNESS: It was probably like more to the left, but it was, you know, yeah, basically it did, but it was more -- it was like on the left, and it was shining over.

PROSECUTOR: So it provided light on the bench where you were?

WITNESS: Yes."

After the incident, T.D. went to Vines' house, where they called the police. T.D. testified that when the police arrived, Vines did most of the talking because she was "shook up" from what had occurred. She could not provide a description that night because she was "so shooken up," but gave one the next day. After speaking with the police, she went to the hospital, and she returned to the police station the next day.

T.D. testified on cross-examination that she met Detective Mannino for the first time when

she went to the hospital; at that time, she was calmer and was able to describe the events of the night. When she spoke with Detective Mannino at the hospital, she gave him descriptions of all three men, including "a light skinned boy that had braids." However, on direct examination, T.D. testified that she spoke to Detective Mannino at the police station the day after the attack and gave him "a description of one that I remembered," who was later identified as Hale. She described the man as "a black guy with -- he was dark, had braids." On direct examination, T.D. recalled giving Detective Mannino a description of defendant as "light skinned with braids," but could not remember when that conversation took place.

On August 9, 2001, T.D. was called back to view a computer screen of photographs. She agreed that looking at the computer screen was similar to looking through mug shots in a book and that they appeared on the screen approximately 12 at a time. T.D. recognized Hale from the first set of photographs and did not look any further after she had identified him. T.D. testified that after she identified Hale, the police officers asked her if she wanted to "do the other photographs," and she responded "no. I picked him out. I just knew that was him." T.D. testified that all of the people on the page were dark-skinned African-American males. Later, Detective Mannino called T.D. and told her that he "had the guy" and that the person apprehended had identified the other two men.

After several days had elapsed, T.D. was called to the station again to view a lineup of six people. She recalled seeing a man with a light complexion and braids in the lineup; when she saw him, she testified that "I just had, I just knew it was him. I just knew. I just had a feeling." When asked whether that meant that she had no doubt when she saw defendant, she replied: "No. I am

not saying it was no doubt, but you know, he just stood out, you know, out of all of them." T.D. acknowledged that defendant was the only person in the lineup with a light complexion and braids; none of the other men had a light complexion, and all of the other men had shaved heads. After identifying defendant in the lineup, T.D. identified defendant from a photo array; the photo array was not on the computer but consisted of six photographs on a file folder. T.D. also identified Shelton from the same lineup and photo array in which she identified defendant.

However, on cross-examination, T.D. testified that she identified defendant and Shelton in the photo array prior to viewing them in a physical lineup. She testified that after identifying Hale, Detective Mannino came to T.D.'s home one morning approximately a week to 10 days later with a folder displaying a photo array of six photographs. All six of the men in the photographs were African-American, but they had different complexions and different hairstyles. T.D. testified that she recognized defendant's skin color and also testified that she recognized his face; he was not wearing braids in the photograph. When the State asked T.D. whether she recognized defendant only based on his skin color, she responded, "No. It was his face," and she said that she knew his face. T.D. also recognized Shelton in the same photo array. On redirect examination, T.D. repeated that she viewed the photo array including defendant and Shelton at her home and not at the police station as she had testified on direct examination; she said that when she testified on direct examination she "was talking about the other" photo array, when she had identified Hale.

Later on the same day, T.D. went to the police station to view a police lineup, during which she identified defendant and Shelton. T.D. testified that she went into the room to view the

7

lineup alone and that her instructions were to let Detective Mannino "know if anyone looks familiar." Detective Mannino did not "definitely tell" her that someone from the crime was in the lineup. During the lineup, all of the men were seated, then individually stood up and turned around. T.D. testified that Vines also viewed a lineup, although they did not view it together, and she did not tell him who she chose.

The State questioned T.D. about her testimony on direct examination in which she testified that she identified defendant and Shelton in the physical lineup prior to identifying them in the photo array:

"PROSECUTOR: So just for the record, the question I am asking you clearly is did you see the photo array first or the line up first?

WITNESS: I seen the photo first.

PROSECUTOR: Okay. So when [defense counsel] was asking you were you confused about what you had seen at what time?

WITNESS: Yeah, he was, he was confusing me, yeah.

PROSECUTOR: And just so we know for the record, we're calling the computer screen the photo array [and] the one with the real bodies the line up.

So you saw the photo array in the morning.

WITNESS: And then the line up.

8

PROSECUTOR: In the evening?

WITNESS: Yes."

Detective Christopher Mannino, the lead detective on the case, also testified at the hearing and was able to supply exact dates for the steps of his investigation. Detective Mannino testified that in the early morning hours of August 7, 2001, he spoke with Vines, who gave him a description of the three men who had attacked him and T.D., saying that they were three male blacks roughly in their late teens. Detective Mannino also spoke briefly to T.D. at that time, and he spoke to her again at the hospital. At the hospital, T.D. provided Detective Mannino descriptions of all three men: "One was a male black with braids. She said he had distinctive facial features in his mouth and nose area. She described the second male black that was light skinned with braids; and then the third that was medium skinned, had a somewhat receding hairline, looked a little bit younger."

On August 9, 2001, Detective Mannino contacted T.D. and Vines and had them come to the Park Forest police station to view a photo array on a computer.[1] When they viewed the first screen of photographs, there was "spontaneous excitement," and both identified Hale as one of the attackers. After Hale subsequently identified defendant and Shelton, Detective Mannino arranged a photo array consisting of six photographs on a folder, including those two suspects. He showed T.D. the photo array on August 16, 2001, at her aunt's home, and also showed the photo array to Vines at his home on the same day. Both witnesses identified defendant in the

_____

[1] Detective Mannino's testimony did not specifically indicate whether T.D. and Vines viewed the photo array separately or together.

photo array, and T.D. also identified Shelton; Detective Mannino testified that T.D. did not show any hesitancy in identifying defendant. Detective Mannino explained that the photographs in the photo array were individuals who had been arrested in Park Forest and that he had difficulty finding photographs that were similar to defendant's because defendant "has such a unique skin coloring." Detective Mannino also confirmed that both witnesses positively identified defendant despite his being bald in the photo array.

After the witnesses identified defendant and Shelton, defendant and Shelton were arrested on the evening of August 16, 2001, and T.D. and Vines separately viewed a physical lineup containing them that same evening. T.D. positively identified defendant and Shelton; Vines identified defendant but was unable to positively identify Shelton. Detective Mannino testified that T.D. displayed no hesitancy in identifying defendant and that defendant was the first person she picked; Vines similarly displayed no hesitancy in identifying defendant. Detective Mannino confirmed that he had difficulty finding people for the lineup that had defendant's exact skin tone.

In closing, defendant again argued that the photo array was viewed after the lineup and that T.D.'s account of the order of events changed on cross-examination. He also argued that her identification was unreliable, emphasizing that she had never seen defendant before, that the incident occurred at night in a park that was not well lit, under circumstances "so startling and excitable" that immediately after the incident, T.D. was unable to provide a description of any of the men. Defendant further argued that the descriptions given by T.D. and Vines were vague and that "thousands of people running around the south suburbs of Chicago" fit the description of a light-skinned African-American teenager with braids. Defendant ended his argument by again

10

emphasizing that due to the "the trauma involved in this incident," T.D.'s "opportunity and her degree of attention at the time of the incident should really be called into question."

During its closing, the State argued that the lineup and photo array were not suggestive and that the identifications made were reliable. Additionally, the State argued that T.D. had an opportunity to view defendant at the time and that the circumstances did not impede her memory. As part of its argument, the State noted:

"It might not be a well lit park, Judge, but she had said it happened almost immediately underneath a light post. May be [*sic*] the park's not that well lit, but this person and his cohorts decided to make their attack where it is well lit, Judge. That is unimpeached."

In ruling on the motion, the trial court noted that "I have viewed the photo array and the line up, and based on the testimony I heard here today, neither are perfect." However, the court found that the lineup and photo array were not so unduly suggestive as to cause a misidentification and denied defendant's motion to suppress the identification.

*Trial*

On April 26, 2005, defendant's trial began. The State indicated that it would be proceeding on four counts of the indictment, including two counts of aggravated criminal sexual assault and two counts of armed robbery. As its first witness, the State called T.D. T.D. testified that on August 6, 2001, she was 18 years old and had been visiting her aunt in Park Forest. Earlier that day, she had met Vines for the first time and had gone to his house to watch a movie.

11

After the movie, it was late, and Vines walked T.D. to her aunt's house, which was approximately a block from Vines' house. On their way, they decided to stop at nearby Eastgate Park to "sit down and talk for a while."

At approximately 11 p.m., she and Vines were walking through Eastgate Park when they encountered three men. The men asked if T.D. and Vines smoked "weed"; they responded that they did not and continued walking. T.D. testified that she and Vines "didn't think anything of that." After they had gone a few feet, T.D. testified that the men said "should we get them" and came up behind her and Vines. They turned around and saw the three men, one of whom was pointing a gun at them, "in our face." When T.D. turned around, the first thing she saw was "[t]he gun to the head." T.D. testified that she was able to see their faces, but they were wearing hooded sweatshirts.

The State asked T.D. whether there was any lighting at the location, and T.D. responded, "Yes. It was like apartment buildings in the back of the park where there [sic] lights, you know." T.D. described Eastgate Park as having a path from the sidewalk to the "park."[2] There was a bush along the path, where the men were standing when they first spoke. There was a bench facing the "park" and an open field on the other side of the "park." T.D. testified that there were townhouses either behind or in front of the "park," and the light came from there. She also indicated that there was a school across the street, and the parking lot for the school had "a lot of light."

_____

[2] From the record, the area referred to as the "park" appears to be a playground area within Eastgate Park.

On cross-examination, T.D. explained more about the lighting:

"DEFENSE COUNSEL: Now, on direct you told the

State's Attorney about some town homes or other properties sitting

near the park?

WITNESS: Yes.

* * *

DEFENSE COUNSEL: Any light in the park came from

whatever reflection on those buildings?

WITNESS: Right. The school and apartment buildings.

DEFENSE COUNSEL: Now, in the park *** are there any

lights posted in the park?

WITNESS: No, there is not.

DEFENSE COUNSEL: Any lamps or lanterns in the park?

WITNESS: No.

DEFENSE COUNSEL: Only light could possibly illuminate

over the park area came from those buildings?

WITNESS: Yes."

When the men pointed the gun at T.D. and Vines, they told Vines to give them his watch

and forced T.D. to give them her purse. The men then forced them to lie facedown on the

ground; T.D. testified that she followed their directions and faced the ground. T.D. heard the

men say that she did not have anything in her purse, and one of the men told T.D. to stand up and

13

patted her down from behind. One of the men indicated that T.D. had a nice body and said that, since she did not have any money, she had to "do something" for them. The men told her to remove her clothing. T.D. testified that while the men were talking, they were "maybe on the side of" her and kept the gun pointed to the back of her head.

T.D. removed her clothing very slowly until one of the men told her to hurry up or they would shoot her. T.D. testified that while she was removing her clothing, Vines was lying on the ground facing away from her, so he was unable to view what was happening. After she had removed her clothes, the men told T.D. that she needed to perform oral sex on them. The first man, Hale, sat on a bench and forced T.D. to sit on the bench and perform oral sex on him; defendant was standing next to T.D., holding a gun to her head. One of the men told T.D. to "do it right or I'm going to shoot you." T.D. testified on cross-examination that she was leaning "[s]omewhat forward to the side," and was "face down." Defendant then took T.D.'s head and forced her to perform oral sex on him while he was standing in front of her; Hale took the gun and pointed it at her. T.D. testified that she was "looking up." While T.D. was performing oral sex on defendant, three boys rode up on their bicycles, so defendant had T.D. stop and defendant and Shelton chased the boys away. T.D. was then forced to perform oral sex on Hale again until she stopped and said "shoot me." Hale then told T.D., "oh, it is going to be all right. Don't cry," and then "got up and left."

T.D. testified that she had an opportunity to "get a good look at" the three men and had a clear view of their faces. She testified that she saw defendant's face clearly "[w]hen he came on the side of me. And, I had to suck his penis. I was sitting down, and I was looking up. And, also

Antonio Hale 'cause he was sitting down; and I had to look at him." She confirmed that there was enough light for her to be able to clearly observe their faces, their sizes, and their hairstyles. T.D. testified that the hoods on their sweatshirts were not up while she was performing oral sex on Hale and defendant, and there was lighting in the park.

After the three men left, Vines stood and helped T.D. dress, collected her purse, and carried her to his mother's house. Vines told his mother what had occurred and they called the police. When the police arrived, T.D. talked to them briefly and gave a general description of "three black guys." They then went to the police station for a few minutes, where T.D. first met Detective Mannino, and then went to the hospital. At the hospital, T.D. was examined and a rape kit was collected; however, T.D. testified that neither defendant nor Hale had ejaculated into her mouth. At approximately 1 a.m., T.D. again spoke with Detective Mannino and gave him a "better" description of the three men.

On August 9, 2001, T.D. went to the Park Forest police station, where she spoke to a police officer and described Shelton's facial features so that the officer could make a composite sketch on the computer, including a description that Shelton was a "dark guy" with a low cut hairstyle called a "fade." T.D. testified that she described the other two men for the police to make composite sketches, but the police did not make sketches of the other two men. On the same day, she viewed a photo array of images on the computer based on her descriptions of Hale, who she described as a "dark guy with braids," and defendant, described as "[l]ight skinned with braids." T.D. and Detective Mannino looked at approximately 12 images at once on the computer screen, and T.D. recognized Hale on the first page of photographs. T.D. testified that

15

she continued looking at photographs, and saw a total of approximately 250, but was unable to identify anyone else.

On August 16, 2001, T.D. viewed Hale in a physical lineup and identified him; she was alone with Detective Mannino in the room during the lineup, and he did not suggest to her who she should choose. Later that day, Detective Mannino came to her aunt's house with a folder containing six photographs and asked whether "anyone look[ed] familiar" to her. T.D. identified defendant and Shelton from the folder; she did not hesitate when identifying defendant. In the photograph, defendant was bald, but T.D. was able to identify him because she "kn[e]w his face." Later that day, Detective Mannino asked T.D. to come to the police station to view another lineup, and T.D. identified defendant and Shelton. T.D. acknowledged that defendant was the man in the lineup with the lightest complexion. T.D. also identified defendant in court, saying that she knew that he was the man who attacked her because "I will never ever forget. I'll never forget none of these faces."

The State then had T.D. examine five photographs of Eastgate Park, including photographs taken in the evening where lights were visible, and also had her circle the area where the incident occurred.

During cross-examination, defense counsel asked T.D. about her pretrial testimony that there were lights over the benches. T.D. clarified that there were no lights over the benches but that there was light coming from the apartment building behind the park. She opined that there was not enough light to read, but that there was enough light for children to play in the park.

The State's second witness was Dorwin Vines. Vines testified to similar facts concerning

16

the night of August 6, 2001, as T.D. had. Vines saw the faces of all three men, and said that there was lighting in the park; he later testified that he saw two of the men well. Since he was lying facedown on the ground, Vines was unable to observe what was occurring but was able to hear what was happening. Vines further testified that several days after the incident, he was asked to come to the police station to view photographs on the computer; he identified Hale. A few days later, Vines identified Hale in a physical lineup at the police station. On the same day, the police came to Vines' home and showed him several photographs, and Vines identified defendant. Vines identified defendant a second time when he selected him from a lineup. Vines also identified defendant in court.

The State's third witness was Officer Padilla. Officer Padilla testified consistently with his pretrial testimony that he responded to the call of a sexual assault and armed robbery on August 6, 2001, and met with Vines. Officer Padilla then explained that he was a K-9 officer and had asked Vines to show him where the incident occurred so that the police dog could attempt to track where the offenders had gone. Officer Padilla testified that the dog tracked the scent across the street, to the school parking lot, over nearby railroad tracks, to a location approximately two blocks from 1935 River Street in Chicago Heights, which was where defendant was arrested. Officer Padilla also testified to the lighting surrounding the park and that the area with the benches where the incident occurred was approximately 500 feet from the main street.

Captain Greg Baker of the Park Forest police department also testified, confirming that he arrested defendant and Shelton on August 16, 2001, outside 1935 River Street in Chicago Heights. Finally, the State called Detective Mannino, who testified consistently with his testimony

17

during the motion to suppress concerning his investigation and the identifications made by T.D. and Vines. The State then rested its case, and defendant moved for a directed verdict, which was denied.

Defendant called one witness in his defense, Samuel Bell, a private investigator. Bell testified that he took photographs of Eastgate Park at defendant's request at approximately 11 p.m. on March 12, 2005, and further testified that he needed to use the flash "because there is no lighting in that section down there."

The jury found defendant guilty of aggravated criminal sexual assault of T.D. and armed robbery of both T.D. and Vines, and the trial court entered judgment on the verdict. Defendant filed a motion for a new trial, which was denied. Defendant was sentenced to 10 years' imprisonment on each of the counts of armed robbery, running concurrently, and 15 years' imprisonment on the count of aggravated criminal sexual assault,[3] to run consecutively to the sentence for armed robbery. Defendant orally made a motion to reduce the sentence, which was denied. Defendant appealed his conviction, and we affirmed. *People v. Lacy*, No. 1-05-2137 (2007) (unpublished order under Supreme Court Rule 23).

*Postconviction Petition*

On June 24, 2008, defendant filed a petition for postconviction relief, in which he argued that his trial counsel was ineffective during the motion to suppress identification and at trial. Defendant argued that his trial counsel was ineffective during his motion to suppress because (1) counsel failed to view the scene of the crime, (2) counsel failed to view all of the mug shot

---

[3] The two counts of aggravated criminal sexual assault were merged.

evidence of the Park Forest police department, and (3) counsel failed to properly question T.D. regarding her identification of the suspects. Defendant further argued that his trial counsel was ineffective at trial because (1) counsel failed to properly impeach T.D. with her testimony from the motion to suppress hearing, (2) counsel failed to present evidence that there was no lighting at Eastgate Park, (3) counsel failed to cross-examine T.D. regarding her ability to identify the suspects, (4) counsel failed to object to Officer Padilla's testimony concerning K-9 tracking, (5) counsel failed to cross-examine Officer Padilla about the K-9 tracking, and (6) counsel failed to call an alibi witness on defendant's behalf. Defendant also argued that the cumulative nature of the errors resulted in him receiving ineffective counsel. Defendant attached an affidavit from Matt Gross, a maintenance man working at the apartments near the park, stating that there was no artificial lighting in the park and that the closest light to the park was a single 70-watt recessed light approximately 120 feet from the benches. Defendant also attached an affidavit from the alibi witness, Brenda Rosemond. In her affidavit, Rosemond said that she was defendant's aunt and that defendant lived with her as a ward of the state. She further stated that defendant was living with her in Chicago at the time of the attack and that defendant was home with her for the entire night, beginning at 9 p.m.; her affidavit indicated that defendant was not permitted to go to Chicago Heights. Additionally, she stated that she had contacted the public defender's office to inform them of her willingness to testify and that she had met with the public defender's office.

Defendant's petition was docketed on September 10, 2008, and on January 30, 2009, the State filed a motion to dismiss the petition for postconviction relief. The State argued that defendant's allegations should be barred due to *res judicata* or deemed waived. The State also

argued that defendant failed to show that his trial counsel was ineffective. In his response to the motion to dismiss, defendant argued that *res judicata* and waiver should not apply because the failure to raise the issues on direct appeal resulted from ineffective assistance of appellate counsel.

On May 1, 2009, the parties went before the trial court for hearing on the State's motion to dismiss. On September 4, 2009, the trial court ruled on the motion, finding that the petition was not barred by *res judicata*, but was barred by the waiver doctrine. The court additionally found that arguments that trial counsel did not visit the scene were speculative, that decisions about cross-examination and impeachment were trial strategy, and that the decision not to call an alibi witness was also trial strategy. The trial court also noted that the cumulative effect of any decisions by trial counsel did not rise to the level of ineffective assistance of counsel. The court then granted the State's motion to dismiss, finding that defendant had failed to make a substantial showing of a constitutional violation. This appeal follows.

ANALYSIS

On appeal, defendant argues that he made a substantial showing of a constitutional violation and that his postconviction petition should be allowed to proceed to the third stage for an evidentiary hearing. We affirm.

*Stages of a Postconviction Proceeding*

The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2000)) provides a means by which a defendant may challenge his or her conviction or sentence for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006) (citing *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005)). To be entitled to postconviction relief, a

defendant must show that he or she has suffered a substantial deprivation of his federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged. 725 ILCS 5/122-1(a) (West 2000); *Pendleton*, 223 Ill. 2d at 471 (citing *Whitfield*, 217 Ill. 2d at 183).

In noncapital cases, the Act provides for three stages. *Pendleton*, 223 Ill. 2d at 471-72. At the first stage, the trial court has 90 days to review a petition and may summarily dismiss it, if the trial court finds that the petition is frivolous and patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2000); *Pendleton*, 223 Ill. 2d at 472. If the trial court does not dismiss the petition within that 90-day period, the trial court must docket it for further consideration. 725 ILCS 5/122-2.1(b) (West 2000); *Pendleton*, 223 Ill. 2d at 472.

The Illinois Supreme Court has held that, at this first stage, the trial court evaluates only the merits of the petition's substantive claim, and not its compliance with procedural rules. *People v. Perkins*, 229 Ill. 2d 34, 42 (2007). The issue at this first stage is whether the petition presents " ' "the gist of a constitutional claim." ' " *Perkins*, 229 Ill. 2d at 42 (quoting *People v. Boclair*, 202 Ill. 2d 89, 99-100 (2002), quoting *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996)).

In the case at bar, defendant's petition proceeded to the second stage. The Act provides that, at the second stage, counsel may be appointed for defendant, if defendant is indigent. 725 ILCS 5/122-4 (West 2000); *Pendleton*, 223 Ill. 2d at 472. After an appointment, Illinois Supreme Court Rule 651(c) (eff. Dec. 1, 1984) requires the appointed counsel: (1) to consult with petitioner by mail or in person; (2) to examine the record of the challenged proceedings; and (3) to make any amendments that are "necessary" to the petition previously filed by the *pro se*

defendant. *Perkins*, 229 Ill. 2d at 42. Our supreme court has interpreted Rule 651(c) also to require appointed counsel "to amend an untimely *pro se* petition to allege any available facts necessary to establish that the delay was not due to the petitioner's culpable negligence." *Perkins*, 229 Ill. 2d at 49.

The Act provides that, after defense counsel has made any necessary amendments to the petition, the State may move to dismiss it. *Pendleton*, 223 Ill. 2d at 472 (discussing 725 ILCS 5/122-5 (West 2000)). See also *Perkins*, 229 Ill. 2d at 43. If the State moves to dismiss, the trial court may hold a dismissal hearing, which is still part of the second stage. *People v. Coleman*, 183 Ill. 2d 366, 380-81 (1998). A trial court is foreclosed "from engaging in any fact-finding at a dismissal hearing because all well-pleaded facts are to be taken as true at this point in the proceeding." *Coleman*, 183 Ill. 2d at 380-81. A court reviewing a dismissal of a postconviction petition without an evidentiary hearing will do so *de novo*. *People v. Edwards*, 195 Ill. 2d 142, 156 (2001) (citing *Coleman*, 183 Ill. 2d at 389).

In the case at bar, the trial court dismissed defendant's petition at the second stage. On appeal, defendant argues that counsel was ineffective at the motion to suppress and at trial, and claims that his arguments are not barred by *res judicata* or the doctrine of waiver because his appellate counsel was ineffective in failing to raise the claims on direct appeal. We consider each of defendant's arguments in turn.

*Ineffective Assistance of Counsel Standard*

The Illinois Supreme Court has held that, to determine whether a defendant was denied his or her right to effective assistance of counsel, an appellate court must apply the two-prong test set

forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*)). Under *Strickland*, a defendant must prove both (1) his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness; and (2) absent these errors, there was a reasonable probability that his trial would have resulted in a different outcome. *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (citing *Strickland*, 466 U.S. at 687-94).

Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness "under prevailing professional norms." *Colon*, 225 Ill. 2d at 135; *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Under the second prong, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome–or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *Evans*, 209 Ill. 2d at 220; *Colon*, 225 Ill. 2d at 135. In other words, the defendant was prejudiced by his attorney's performance.

To prevail, the defendant must satisfy both prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "That is, if an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003). We do not need to consider the first prong of the *Strickland* test when the second prong cannot be satisfied.

No. 1-09-2863

*Graham*, 206 Ill. 2d at 476.

Ineffective assistance of appellate counsel is determined under the same standard as a claim of ineffective assistance of trial counsel. *Edwards*, 195 Ill. 2d at 163 (citing *People v. West*, 187 Ill. 2d 418, 435 (1999)). Appellate counsel is not required to raise every conceivable issue on appeal, and it is not incompetence for counsel to refrain from raising issues that counsel believes are without merit. *Edwards*, 195 Ill. 2d at 163-64 (citing *People v. Johnson*, 154 Ill. 2d 227, 236 (1993)). Accordingly, unless the underlying issue has merit, there is no prejudice from appellate counsel's failure to raise an issue on appeal. *Edwards*, 195 Ill. 2d at 164 (citing *People v. Childress*, 191 Ill. 2d 168, 175 (2000)).

*Motion to Suppress*

Defendant claims that his trial counsel was ineffective in a number of ways during the hearing on the motion to suppress the identification of defendant. Specifically, defendant argues that trial counsel was ineffective because: (1) counsel failed to view the scene of the crime; (2) counsel failed to subpoena or view all available mug shot evidence of the Park Forest police department; and (3) counsel failed to question T.D. properly regarding her identification of defendant and failed to impeach her from the inconsistencies in her testimony between what she testified to at the suppression hearing and at the trial.

First, defendant claims that trial counsel was ineffective by not viewing the crime scene prior to the suppression hearing to show that T.D. was mistaken about the lighting. Defendant claims that it is clear that trial counsel did not view the scene of the crime because (1) T.D. falsely testified that there was a light directly above the bench where she was forced to provide oral sex

24

and trial counsel was unaware of the lighting conditions, (2) there was no light over the benches, and (3) the closest light to the benches was a recessed 70-watt yellow bulb located approximately 120 feet away on a maintenance shed. The State argues that defendant has failed to support his allegation that counsel never viewed the scene of the crime and, as such, his allegation is conclusory. In a postconviction petition, a defendant must set forth the violations of his constitutional rights, including "affidavits, records, or other evidence supporting its allegations." 725 ILCS 5/122-2 (West 2000); *People v. Collins*, 202 Ill. 2d 59, 65 (2002). In the case at bar, defendant submitted an affidavit from Matt Gross, a maintenance worker from the housing complex near the park, in which Gross indicated that there was no light above the bench and that the closest light was located on the maintenance shed. Additionally, defendant pointed to T.D.'s testimony during the suppression hearing as support for his allegation. We cannot find that defendant's conclusion is without any factual support, and at this point in the proceedings, are required to view any well-pleaded facts as true. See *Coleman*, 183 Ill. 2d at 380-81 (citing *People v. Caballero*, 126 Ill. 2d 248, 259 (1989)).

Nevertheless, we cannot find that a failure to view the crime scene makes trial counsel's performance during the suppression hearing ineffective. Defendant argues that if trial counsel had viewed the crime scene, counsel would have been able to directly impeach T.D. concerning her testimony that there was a light over the bench and that impeachment, combined with "the clear evidence that there was no lighting at the scene of the occurrence," made it likely that the motion to suppress would have been granted. We do not find this argument persuasive.

Even if counsel had not viewed the scene, defendant was not prejudiced by such an

25

omission. Defendant's trial counsel asked T.D. several questions related to the lighting in the park. Additionally, trial counsel questioned Officer Padilla about the lighting in the park, and Officer Padilla agreed that Eastgate Park was "not a well lit park"; counsel specifically referred to this testimony in closing argument. We cannot find that it is reasonably probable that the trial court would have made a different decision had counsel directly impeached T.D. regarding the source of any lighting in the park. T.D. testified to a clear and unobstructed view of her assailants' faces and whether the lighting was good or bad only goes to the weight of her testimony. Vines, who did not comment on the lighting, also made positive identifications of the assailants, including defendant.

Defendant also claims that trial counsel was ineffective in failing to subpoena and view all available mug shot evidence from the Park Forest Police Department. However, defendant offers no support for this claim, nor does he develop his argument further than a one-sentence statement that trial counsel was ineffective. Accordingly, defendant has forfeited this argument on appeal. Ill. S. Ct. R. 341(h)(7) (eff. Sept. 1, 2006); *People v. Fair*, 193 Ill. 2d 256, 269 (2000).

Defendant focuses most of his arguments on the claim that trial counsel failed to sufficiently attack the reliability of T.D.'s identification. In his motion to suppress, defendant claimed that the identification by T.D. and Vines occurred as a result of "grossly suggestive" procedures. Thus, the trial court was required to determine whether the lineup and photo array were unduly suggestive. However, if a court finds that the confrontation was unduly suggestive, its analysis does not stop there. *People v. Bragg*, 277 Ill. App. 3d 468, 474 (1995); *People v. Williams*, 252 Ill. App. 3d 1050, 1057 (1993); *People v. Johnson*, 222 Ill. App. 3d 1, 8-9 (1991);

26

*Manson v. Brathwaite*, 432 U.S. 98, 110 (1977) (rejecting a *per se* approach that would have excluded all unnecessarily suggestive "out-of-court identification evidence"); *Neil v. Biggers*, 409 U.S. 188, 199 (1972) (even if a court finds that the confrontation was unduly suggestive, it must still consider "whether under the 'totality of the circumstances' the identification was reliable"). "If the defendant satisfies this burden, then the burden switches to the State to prove that the identification was 'independently reliable.' " *People v. Rodriguez*, 387 Ill. App. 3d 812, 829 (2008) (quoting *People v. Ramos*, 339 Ill. App. 3d 891, 897 (2003)); *Manson*, 432 U.S. at 110 (permitting the admission of confrontation evidence, despite its suggestiveness, if "the out-of-court identification possesses certain features of reliability"). Thus, to suppress an identification, a court must find both: (1) that the confrontation was unduly suggestive, and (2) that the identification was not independently reliable. *Rodriguez*, 387 Ill. App. 3d at 829 (citing *Ramos*, 339 Ill. App. 3d at 897).

In order to determine whether an identification is reliable, courts look to a number of factors, including (1) the opportunity of the witness to view the suspect at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of any prior descriptions of the suspect by the witness, (4) the level of certainty by the witness at the time of the confrontation, (5) the length of time between the crime and the confrontation, and (6) any acquaintance with the suspect prior to the crime. *People v. Brooks*, 187 Ill. 2d 91, 129-30 (1999) (citing *People v. Enis*, 163 Ill. 2d 367, 398 (1994)); *People v. Denton*, 329 Ill. App. 3d 246, 250 (2002) (citing *Biggers*, 409 U.S. at 199-200); *Williams*, 252 Ill. App. 3d at 1057 (citing *People v. Manion*, 67 Ill. 2d 564, 571 (1977) and *People v. Graham*, 179 Ill. App. 3d 496, 504-05 (1989)).

No. 1-09-2863

In the case at bar, defendant argues that trial counsel did not properly examine T.D. as to these factors. Specifically, defendant claims that (1) counsel failed to question, examine, or cross-examine T.D. regarding her opportunity to view the suspects at the time of the crime, "including but not limited to evidence of lighting, opportunity to observe, position of the suspects, and clothing of the suspects which may have prevented identification of them"; (2) counsel failed to question, examine, or cross-examine T.D. regarding her degree of attention to viewing the suspects; (3) counsel failed to question, examine, or cross-examine T.D. regarding the accuracy of the witness' prior description of the suspects, especially defendant; (4) counsel failed to question, examine, or cross-examine T.D. regarding her level of certainty that she demonstrated at the time of the photo array and lineup; and (5) counsel failed to question, examine, or cross-examine T.D. regarding "other issues related to her identification of the Defendant, *** including, but not limited to, her failure to participate in the making of a composite sketch of the Defendant, *** or her personal desire not to want to look for the light-skinned black male in mug shots."

The State argues that defendant's claims are waived because they could have been raised on direct appeal. A postconviction proceeding is a collateral attack on a prior conviction and sentence. *West*, 187 Ill. 2d at 425 (citing *People v. Brisbon*, 164 Ill. 2d 236, 242 (1995); *People v. Free*, 122 Ill. 2d 367, 377 (1988)). Its remedy " 'is not a substitute for, or an addendum to, direct appeal.' " *West*, 187 Ill. 2d at 425 (quoting *People v. Kokoraleis*, 159 Ill. 2d 325, 328 (1994)). Accordingly, the scope of the proceedings is limited; "[a]ny issues which could have been raised on direct appeal, but were not, are procedurally defaulted [citation], and any issues which have previously been decided by a reviewing court are barred by the doctrine of *res*

28

No. 1-09-2863

*judicata* [citation]." *West*, 187 Ill. 2d at 425.

In the case at bar, defendant argues that his claims should not be considered forfeited because he had ineffective assistance of appellate counsel. The doctrine of waiver does not bar consideration of an issue where the waiver stems from the incompetency of counsel on appeal. *People v. Patterson*, 192 Ill. 2d 93, 120 (2000); *People v. Coleman*, 168 Ill. 2d 509, 522-23 (1995) (citing *People v. Salazar*, 162 Ill. 2d 513, 520-21 (1994), *People v. Winsett*, 153 Ill. 2d 335, 346 (1992), *People v. Flores*, 153 Ill. 2d 264, 282 (1992), and *People v. Ruiz*, 132 Ill. 2d 1, 10 (1989)). However, the claim of ineffective assistance of appellate counsel must appear in the postconviction petition. *People v. Jones*, 213 Ill. 2d 498, 505-06 (2004). See also *West*, 187 Ill. 2d at 434-35 (defendant "specifically alleged" ineffective assistance of appellate counsel in postconviction petition); *Coleman*, 168 Ill. 2d at 522 (claim appeared in postconviction petition); *People v. Mack*, 167 Ill. 2d 525, 531 (1995) (defendant "specifically alleged" ineffective assistance of appellate counsel in postconviction petition). Here, defendant did not raise the issue of ineffective assistance of appellate counsel in his postconviction petition but raised it for the first time in response to the State's motion to dismiss the petition. However, because the State does not raise the failure of the ineffective assistance of appellate counsel claim as a basis for waiver (see *People v. De La Paz*, 204 Ill. 2d 426, 433 (2003) ("It is well established that the State may waive waiver.")), we will consider the merits of defendant's ineffective assistance of appellate counsel claim, which requires us to determine whether defendant's ineffective assistance of trial counsel claim has merit.

Even if defendant's claims are not forfeited, we still cannot find that trial counsel's

29

performance was ineffective. Generally, the examination or impeachment of a witness is considered to be trial strategy, which does not support a claim of ineffective assistance of counsel. *People v. Smith*, 177 Ill. 2d 53, 92 (1997); *People v. Pecoraro*, 175 Ill. 2d 294, 326 (1997). "The manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court." *Pecoraro*, 175 Ill. 2d at 326-27. The only way for a defendant to prevail on his ineffectiveness claim is by "showing that counsel's approach to cross-examination was objectively unreasonable." *Pecoraro*, 175 Ill. 2d at 327. Defendant cannot make such a showing here.

Based on the transcript of the suppression hearing, trial counsel addressed a number of issues that defendant raises on appeal. Counsel asked T.D. about her degree of attention when the men initially approached her and Vines, elicited T.D.'s admission that she was "startled" and "scared" when the men threatened them with the gun, and ascertained the perpetrators' positions in relation to T.D. during the encounter. Counsel also verified that T.D. was "upset" and "crying" while they forced her to remove her clothes, and asked how long the incident took.

Furthermore, trial counsel spent a great deal of time on T.D.'s identification of the men, verifying that T.D. had never seen them previously and discussing every step of the identification process with her. Counsel examined the order of the process, asking questions to determine whether the photo array or the lineup of defendant came first. Counsel also elicited testimony from T.D. that she could not provide a description of the men who attacked her immediately after the incident and that she did not provide police with a height or weight description. Finally, counsel focused extensively on T.D.'s identification during closing arguments, emphasizing that

T.D. had never seen defendant before, that the incident occurred at night in a park with poor lighting under "startling and excitable conditions," that T.D. was unable to immediately provide a description, and that the description provided was "vague" and given the next day. Counsel also asked the trial court to "understand the trauma involved in this incident" and opined that T.D.'s "opportunity and her degree of attention at the time of the incident should really be called into question." We cannot find that this approach by trial counsel was objectively unreasonable.

Moreover, even if we accept defendant's suggestions that trial counsel should have examined the reliability factors more extensively, defendant cannot show that he was prejudiced by this error. As noted, in order to suppress an identification, a court must find both that the confrontation was unduly suggestive and that the identification was not independently reliable. *Rodriguez*, 387 Ill. App. 3d at 829 (citing *Ramos*, 339 Ill. App. 3d at 897). The first step in that analysis is for defendant to demonstrate that the identification was unduly suggestive; then the burden shifts to the State to show that the identification was independently reliable. See *Rodriguez*, 387 Ill. App. 3d at 829. In the case at bar, the trial court found the photo array and lineup were not "so unduly suggestive as to cause a misidentification." The trial court acknowledged that they were not perfect. None of defendant's claims of ineffectiveness would have a bearing on any suggestiveness of the confrontations; they all concern the reliability factors. While defendant claims that the trial court's reference to the "totality of the circumstances" indicates that the court considered reliability, the court specifically found that neither confrontation was unduly suggestive. Thus, it is not reasonably probable that the trial court would have granted defendant's motion to suppress even if trial counsel had performed in the way

that defendant urges in his petition. Accordingly, since defendant's ineffective assistance of trial counsel claim fails, so too must his claim of ineffective assistance of appellate counsel.

*Trial*

Defendant also claims that trial counsel was ineffective during trial. Defendant raises three areas of ineffectiveness: (1) counsel was ineffective in cross-examining T.D., (2) counsel failed to object to testimony concerning K-9 tracking, and (3) counsel failed to call the sole alibi witness on defendant's behalf. Defendant further argues that the cumulative effect of counsel's ineffectiveness both at trial and at the suppression hearing prejudiced defendant.

Cross-examination of T.D.

First, defendant claims that counsel was ineffective in cross-examining T.D. at trial. Specifically, defendant argues that (1) counsel failed to impeach T.D. during cross-examination concerning the lighting conditions at the scene, and did not impeach her with her pretrial testimony that there was a light above the bench; (2) counsel failed to present any evidence concerning the distance of the nearest lighting and did not support that there was no artificial lighting to illuminate the park; (3) counsel failed to adequately cross-examine T.D. about her ability to see, her opportunity to observe, and her emotional state at the time of the crime.

The State again argues that these issues are waived because they could have been raised on direct appeal. Defendant argues that the claims are not waived because he had ineffective assistance of appellate counsel. While defendant did not raise ineffective assistance of appellate counsel in his postconviction petition, the State does not challenge that claim, so we consider it on its merits.

As noted, the examination or impeachment of a witness is generally considered to be trial strategy, which does not support a claim of ineffective assistance of counsel. *Smith*, 177 Ill. 2d at 92; *Pecoraro*, 175 Ill. 2d at 326. "The manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court." *Pecoraro*, 175 Ill. 2d at 326-27. The only way for a defendant to prevail on his ineffectiveness claim is by "showing that counsel's approach to cross-examination was objectively unreasonable." *Pecoraro*, 175 Ill. 2d at 327.

In the case at bar, we cannot find that trial counsel was ineffective in the examination of T.D. at trial because counsel's performance was not objectively unreasonable. Counsel questioned T.D. about the lighting in the park and elicited testimony that there were no artificial lights in the park, and that the only possible illumination of the park was from the nearby school and apartment buildings. Counsel also directly asked T.D. about the distance from the apartment buildings to the park, and T.D. was unable to give a precise distance, saying only "It is not that far." However, as defendant acknowledges, trial counsel did introduce evidence that the main street was approximately 500 feet away from the park and introduced a photograph of the park at night, taken using a flash "because there is no lighting in that section down there." Thus, there was evidence about lighting and distance introduced during trial. See *West*, 187 Ill. 2d at 434 (finding no prejudice where the evidence that defendant claimed should have been introduced was in the trial record through another witness' testimony).

Moreover, trial counsel did in fact ask T.D. specifically about her pretrial testimony. Counsel reminded T.D. that she had testified that there were lights over the benches, and T.D.

replied, "Yes. But, that was lights from the back of the park." Counsel again asked her, "You testified there was a light over the bench. Was there a light?" After an objection to the form of the question was sustained, counsel rephrased, asking "[W]as there lights over the bench or no?" T.D. replied, "No. The light was coming from the apartment building behind the park." Counsel then continued questioning T.D. about the lighting, and T.D. testified that the lighting in the park was not bright enough to read by, but was bright enough that children could play without falling.

Defendant also takes issue with trial counsel's questioning of T.D.'s body position, arguing that counsel elicited damaging testimony that T.D. was looking at defendant's face while performing oral sex, and then failed to follow up with questions that would have been favorable to defendant. We note that defendant raised the exact opposite argument in his claim regarding the suppression hearing; there, defendant faulted counsel for *not* asking a question about T.D.'s body position. Here, we cannot fault counsel for not asking more questions regarding T.D.'s body position. At that point, counsel had spent several pages of the trial transcript in questioning T.D. about her body position when she was performing oral sex on Hale, defendant, and Hale for the second time; the questioning appears to have included T.D. physically demonstrating the way that her body was positioned. T.D. admitted being face down when performing oral sex on Hale; it is reasonable for trial counsel to have moved onto another subject, particularly when performing the delicate task of cross-examining the victim of a sexual assault in front of a jury. See, *e.g.*, *People v. Rodriguez*, 364 Ill. App. 3d 304, 314 (2006) (finding that it was trial strategy not to question sexual assault victim more forcefully about consent where " 'the only purpose that would have been served would have been to hammer the forcefulness of the act into their minds' "). The

same analysis applies to trial counsel's failure to question T.D. about her emotional state. While her emotional state may have had some impact on her ability to identify defendant, having her testify as to it may have had the effect of making the jury more sympathetic to T.D., and we cannot say that counsel's choice not to cross-examine her on that issue was objectively unreasonable.

Moreover, even if counsel's conduct had been objectively unreasonable, defendant cannot show that he was prejudiced. T.D. identified all three offenders in a photo array and in a physical lineup, and also identified defendant in court; Vines identified defendant and Hale in both a photo array and lineup, and he identified defendant in court. The identification of defendant in the photo array occurred even though defendant was bald in the photograph and was wearing braids at the time of the attack. Both T.D. and Vines identified defendant without any hesitation. Thus, defendant cannot show that if counsel had examined T.D. in the way that he urges, that the jury's decision would have been different. Accordingly, since trial counsel was not ineffective, neither was appellate counsel.

### K-9 Tracking

Defendant also argues that trial counsel was ineffective for failing to object to Officer Padilla's testimony regarding K-9 tracking, because evidence of K-9 tracking is inadmissible in Illinois. While defendant did reference the testimony of Officer Padilla in his postconviction petition, his grounds of error were different; however, because the State did not challenge this argument, we need not consider whether waiver applies on this basis. The State does argue that the issue has been forfeited because it was not raised on direct appeal. Again, defendant raises

ineffective assistance of appellate counsel and we consider the merits of the claim.

As defendant notes, Illinois courts have long held that bloodhound evidence is inadmissible to establish any factual proceeding in a criminal case. See *People v. Cruz*, 162 Ill. 2d 314, 369-70 (1994); *People v. Lefler*, 294 Ill. App. 3d 305, 308 (1998); *People v. Stewart*, 229 Ill. App. 3d 886, 890 (1992); but see *People v. Holmes*, 397 Ill. App. 3d 737, 745-46 (2010) (finding no ineffective assistance of counsel for failure to object to testimony concerning use of dog-tracking to discover drugs). Defendant claims that this case is analogous to *Lefler*, in which the court held that counsel's failure to object to canine-tracking evidence fell below the standard of objective reasonableness. *Lefler*, 294 Ill. App. 3d at 311. The State, on the other hand, argues that the reliability and admissibility of canine tracking has changed significantly since the last time the Illinois Supreme Court spoke on the issue and there was no guarantee that an objection would be sustained.

In *Cruz*, our supreme court reaffirmed that "bloodhound evidence is inadmissible to establish any factual proposition in a criminal proceeding in Illinois." *Cruz*, 162 Ill. 2d at 369-70. In that case, the dog-tracking evidence was used by the State to attack the veracity of a witness' statement, and to support its proposition that the witness did not act alone in committing the crime. *Cruz*, 162 Ill. 2d at 368. However, even after *Cruz*, courts have held that it is not error for a trial court to allow evidence of canine tracking to be used to corroborate other trial testimony. See, *e.g.*, *Holmes*, 397 Ill. App. 3d at 745; *People v. Moore*, 294 Ill. App. 3d 410, 416 (1998).

We note that defendant is not arguing that the trial court erred in admitting the K-9

tracking evidence, but that trial counsel was ineffective in failing to object to the testimony. Here, we need not reach the issue of whether counsel's behavior fell below the standard of reasonableness because there was no prejudice from any error. The K-9 tracking did not lead to defendant. It only led to two blocks from where defendant was arrested on a later date. Even without the K-9 tracking, T.D. and Vines provided strong identification evidence against defendant. They each identified him three times: in a photo array, in a physical lineup, and in court. Moreover, T.D. demonstrated that she had been able to see the men who attacked her when she also identified Hale and Shelton in a photo array and lineup. Thus, even if the admission of the K-9 evidence was error, it was not prejudicial.

Alibi Witness

Defendant next claims that trial counsel was ineffective in failing to call Brenda Rosemond on defendant's behalf as an alibi witness. Defendant argues that the State's case against him was not strong and so it was a "critical mistake" not to call Rosemond, who was prepared to testify that defendant was at her home at the time of the attack. In her affidavit, Rosemond said that she was defendant's aunt, and that defendant lived with her as a ward of the state. She further stated that defendant was living with her in Chicago at the time of the attack and that defendant was home with her for the entire night, beginning at 9 p.m.; her affidavit indicated that she had contacted the public defender's office to inform them of her willingness to testify and that she had met with the public defender's office.

We cannot find that counsel's behavior here was objectively unreasonable. The decision of what witnesses to call is a matter of trial strategy, which is generally immune from claims of

37

ineffective assistance of counsel. *West*, 187 Ill. 2d at 432. Here, counsel could have decided that Rosemond's testimony would not be helpful. Rosemond was a relative of defendant's, which could cause the jury to afford her testimony less weight. See *People v. Dean*, 226 Ill. App. 3d 465, 468 (1992) (finding that decision not to call alibi witnesses was trial strategy because all three may have been relatives of defendant and their testimony would thus be afforded little weight). Further, her affidavit indicated that defendant was not permitted to go to Chicago Heights; however, when defendant was arrested, he was standing in front of 1935 River Street in Chicago Heights. Thus, even from the face of the affidavit, there is a contradiction between the statements in the affidavit and the evidence. We also note that someone from the public defender's office spoke with Rosemond, so the office was aware of Rosemond and, presumably, of her intended testimony. Therefore, we cannot find that it was objectively unreasonable not to call her as an alibi witness.

## Cumulative Effect of Errors

Finally, defendant claims that while each instance of error may not rise to the level of ineffective assistance of counsel, the cumulative effect of them does. We cannot agree. We have considered each objected-to action of trial counsel, and have found none of them to be improper. "The whole can be no greater than the sum of its parts ***." *People v. Albanese*, 102 Ill. 2d 54, 82-83 (1984). Thus, the cumulative effect of them does not rise to the level of ineffective assistance of counsel.

## CONCLUSION

We cannot find that defendant made a substantial showing of a constitutional violation

because defendant did not demonstrate that counsel was ineffective during the suppression hearing, at trial, or on appeal. Therefore, it was appropriate for the trial court to dismiss defendant's postconviction petition at the second stage.

Affirmed.