2020 IL App (1st) 162723-U

No. 1-16-2723

Order filed January 27, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 12889 |
| | ) | |
| ROBERT MORRIS, | ) | Honorable |
| | ) | Allen F. Murphy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE PIERCE delivered the judgment of the court.
Presiding Justice Griffin and Justice Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The summary dismissal of defendant's *pro se* postconviction petition is affirmed over his contention that the petition presented an arguable claim of ineffective assistance of appellate counsel.

¶ 2    Defendant Robert Morris appeals from the summary dismissal of his *pro se* petition for relief filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). On appeal, defendant contends that the circuit court erred when it dismissed his petition because it presented an arguable claim that he was denied the effective assistance of appellate

counsel where counsel failed to challenge the sufficiency of the evidence on direct appeal. We affirm.

¶ 3     On April 3, 2009, 79-year-old Robert Sanders was shot during an attempted robbery. He died on April 30, 2011. Defendant was charged with 20 counts of first degree murder and 3 counts of attempt armed robbery. The State proceeded on three counts of first degree murder (720 ILCS 5/9-1(a)(1)-(3), (b)(6) (West 2008)), and one count of attempt armed robbery (720 ILCS 5/8-4 (West 2008); 720 ILCS 5/18-2(a)(4) (West 2008)). Following a jury trial, defendant was sentenced to 80 years in prison for first degree murder.[1] We recite only those facts necessary to our disposition.

¶ 4     At trial, Sandra Jefferson, Sanders's granddaughter, testified that at the time of the shooting, Sanders was 79 years old and lived independently. Following the shooting, Sanders was either in a hospital, a rehabilitation facility, or a nursing home, until he died.

¶ 5     Dr. Ariel Goldschmidt testified that he performed an autopsy on Sanders on May 3, 2011, and discovered gunshot injuries to the right knee, stomach, pancreas, liver, small intestine, and right kidney. Dr. Goldschmidt opined that the cause of death was aspiration pneumonia due to multiple gunshot wounds and that the manner of death was homicide.

¶ 6     William Binns testified that on the morning of April 3, 2009, he was at a currency exchange cashing a check. There were cars in the parking lot, including a tan Buick with an older man in the driver's seat. As Binns waited, he looked outside to check on his vehicle. He noticed a tall "dark-skinned guy" wearing a grey hoody or sweater open the front passenger door of the older man's vehicle and get inside. Binns then saw the men struggling for a few minutes.

---

[1]The record on appeal does not contain volume 7 of the report of proceedings, which relates to pretrial proceedings that are not relevant to the issue on appeal.

Nothing blocked his view of what was happening in the vehicle. Binns next heard "[a]t least two or three" gunshots. Binns saw the man in the grey hoody exit the vehicle, close the door, and quickly walk away. As the man walked past the currency exchange, he put his hand in his pocket. Binns did not see the man wearing a glove but saw his face. He identified defendant in court as this person. Binns went outside to check on his vehicle and saw that the older man had been shot and was bleeding from the leg and stomach. Binns spoke to police at the scene, and on April 21, 2009, he identified defendant in a lineup.

¶ 7     During cross-examination, Binns testified that two to three minutes passed from the time he first saw defendant until defendant left the scene, and that he only saw defendant's face for part of that time. Binns testified that defendant weighed 135 to 145 pounds on the day of the incident. There were signs in the window that Binns was looking out of, but no people blocked his view. When Binns heard the gunshots, he stayed where he was and did not try to take cover. He was scared, focused on his personal safety, and worried that the shooter might enter the currency exchange. He did not see a firearm. He acknowledged that Sanders's vehicle was a blue Chevrolet rather than a tan Buick, but explained that it had been four years since the shooting.

¶ 8     During redirect, Binns testified that the signs in the window were in the bottom corner of the windowpane and did not block his view. After the gunshots, he continued to watch Sanders's vehicle. When defendant walked in front of the currency exchange, Binns saw his whole face. He watched defendant closely because he was concerned for his safety and to make sure that any weapon that defendant had was not turned on him.

¶ 9 Calumet City firefighter-paramedic Joseph Brazzale testified that when he arrived at the scene, he observed an elderly man in the driver's seat of a vehicle. The man had blood on his hands and shirt, was conscious, and stated that someone tried to rob him and shot him.

¶ 10 Calumet City police officer and evidence technician George Jones testified that after paramedics left with Sanders, he photographed the scene and dusted for fingerprints. He located prints on the passenger door of Sanders's vehicle. Later, at a police station, Jones lifted prints from the interior and exterior front passenger window and the exterior front passenger door.

¶ 11 Calumet City police officer Michael Serrano testified that around 7:30 p.m. on April 20, 2009, he took defendant's fingerprints.

¶ 12 Calumet City police sergeant Kevin Rapacz testified that around 11:45 a.m. on April 21, 2009, he went to a hospital to show Sanders a photographic array which included defendant's photograph. Sanders was "alert," but could not speak and communicated by shaking his hand or head and using his hands. Rapacz was present when Binns identified defendant in a lineup.

¶ 13 Calumet City police lieutenant Casey Erickson testified that he learned that the prints recovered from the crime scene belonged to defendant. After defendant was taken into custody on April 20, 2009, Erickson met with defendant and advised him of the *Miranda* rights. During their subsequent conversation, defendant denied knowing anything about an armed robbery, but admitted that "he may [have] been in that area on that day and time." When defendant was told that he was going to be placed in a lineup, defendant asked whether "the old man was okay." Erickson had not mentioned an old man; defendant was merely told about an attempted armed robbery.

¶ 14 The next afternoon, after advising defendant of the *Miranda* rights, Erickson told him that he had been identified in the lineup. Defendant asked if the old man was "able" to come in and pick him out of the lineup. When Erickson stated that someone had been shot, defendant stated that " 'It wasn't cold-blooded.' " At this point, defendant was sitting "hunched over" with his head down and was not making eye contact. Erickson characterized defendant as "a little upset." On cross-examination, Erickson denied accusing defendant of shooting Sanders in cold blood.

¶ 15 Frank Senese, a latent print group supervisor with the Illinois State Police, testified that in April 2009, he received the latent print lifts from Sanders's vehicle. The print lifts were from the passenger window and the door frame. Senese entered a print recovered from the exterior of the front passenger window into AFIS (Automatic Fingerprint Identification System) and received a "perfect score" for defendant. He obtained defendant's fingerprint card, compared it to three of the prints from Sanders's vehicle, and made an identification. Senese then notified the police. The following month, Senese received defendant's inked prints. He compared the latent prints to defendant's inked prints and again concluded that there was a match.

¶ 16 After the State rested, the defense presented the testimony of Jack Spinks. Spinks testified that a person was shot while Spinks was getting money at a currency exchange. Although he heard the shots and saw people in a vehicle, he could not see the face of the man who exited the vehicle because the man was wearing a hoody. However, Spinks did see a silver revolver in the person's hand. Later, at a police station, he viewed a lineup. Spinks testified that "they told me I picked the wrong one in the lineup because I didn't see his face." Later, at his home, "[t]hey" told him he picked the wrong person.

¶ 17    Erickson was recalled and testified that he was present when Spinks viewed the lineup. To Erickson's recollection, Spinks did not identify anyone. After Erickson's recollection was refreshed with a lineup form, he testified that the form stated "negative ID" by Spinks, which meant that Spinks did not identify defendant.

¶ 18    Assistant State's Attorney Andrea Grogan testified that she met with Erickson on April 21, 2009, and that Erickson told her everything that defendant said earlier that day. Defense counsel then asked, "during that conversation Det. Erickson never told you that [defendant] had said, It wasn't cold blooded, or, How was the old man doing; did he?" Grogan replied that she did not remember "every word" Erickson used, but she believed that he told her everything that defendant said. She admitted that her written summary of the conversation did not include these two phrases.

¶ 19    Robert Sanderson, an expert in video forensics, testified he analyzed video footage of a person running down an alley and focused on the person's left arm, wrist, and hand.[2] The footage, as well as certain "raw frames" and "enhancement frames," were published to the jury. In his analysis, Sanderson noticed a dark band on the person's hand which he believed to be some type of "covering." During cross-examination, he acknowledged that neither a "flesh covered hand" nor a face could be seen in the footage.

¶ 20    Kenneth Moses, an expert in crime scene analysis and latent print identification and comparison, testified that his examination of the prints found on the door handle of the vehicle from the crime scene led him to conclude that they were glove prints. He also examined the lifts

---

[2]During Sanderson's testimony, the parties stipulated that Monjet Shoman owned a shoe store on Sibley Boulevard and had a surveillance camera that overlooked an alley. On the morning of April 3, 2009, the camera recorded a man in a gray hoody running eastbound down the alley.

from the exterior passenger window, identified glove "smudges," and believed that the prints predated the glove print because the fingerprint did not disrupt the glove print.

¶ 21    The jury found defendant guilty of first degree murder and attempt armed robbery. The court merged the guilty findings and sentenced defendant to 80 years in prison for first degree murder. The sentence consisted of 50 years for first degree murder and a 30-year enhancement for personally discharging a firearm that proximately caused the death of another.

¶ 22    On direct appeal, defendant contended that the trial court (1) erroneously barred him from eliciting testimony regarding a witness's exclusion of him from the lineup when that witness was deceased at the time of trial, (2) erroneously allowed Rapacz to testify that Sanders reviewed a photo array containing defendant's photograph and admitted that photo array into evidence, (3) abused its discretion in precluding Sanderson from opining that an individual in a surveillance video was wearing a glove, (4) abused its discretion in admitting expert fingerprint evidence based upon the ACE-V method of latent fingerprint analysis, (5) incorrectly admonished defendant regarding the potential sentence he faced at the time the State's plea offer was pending, and (6) improperly considered irrelevant factors when sentencing him to 80 years in prison. We affirmed. See *People v. Morris*, 2015 IL App (1st) 140846-U.

¶ 23    In August 2016, defendant filed a *pro se* postconviction petition alleging that he was denied the effective assistance of trial and appellate counsel and that the evidence at trial was "constitutionally insufficient." The petition alleged, in pertinent part, that appellate counsel was deficient for failing to challenge the sufficiency of the evidence on direct appeal, including Binns's identification of defendant. The circuit court summarily dismissed the petition as frivolous and patently without merit. Defendant filed a timely *pro se* notice of appeal.

¶ 24 On appeal, defendant contends that the circuit court erred when it summarily dismissed his *pro se* postconviction petition because it set forth an arguable claim of ineffective assistance of appellate counsel based upon counsel's failure to challenge the sufficiency of the evidence as to his identification on direct appeal.

¶ 25 The Act provides a procedural mechanism through which a defendant may assert a substantial denial of his constitutional rights in the proceedings which resulted in his conviction. 725 ILCS 5/122-1 *et seq*. (West 2016). A proceeding initiated under the Act is "not a substitute for a direct appeal, but rather is a collateral attack on a prior conviction and sentence." *People v. Davis*, 2014 IL 115595, ¶ 13. The Act allows inquiry into constitutional issues arising in the original proceeding that were not raised and could not have been adjudicated on direct appeal. *Id.* Issues raised and decided on direct appeal are barred by the doctrine of *res judicata*, and issues that could have been raised on direct appeal, but were not, are forfeited. *Id*.

¶ 26 At the first stage of proceedings under the Act, a defendant files a petition, which the circuit court independently reviews and, taking the allegations as true, determines whether it is frivolous or is patently without merit. *People v. Tate*, 2012 IL 112214, ¶ 9. A petition should be summarily dismissed as frivolous or patently without merit only when it "has no arguable basis in either fact or law." *People v. Hodges*, 234 Ill. 2d 1, 12 (2009). A petition lacks an arguable basis in fact or law when it "is based on an indisputably meritless legal theory or a fanciful factual allegation." *Id.* at 16. Fanciful factual allegations are those which are "fantastic or delusional," and an indisputably meritless legal theory is one that is "completely contradicted by the record." *Id*. at 16-17. We review the summary dismissal of a postconviction petition *de novo*. *Id.* at 9.

¶ 27    "At the first stage of proceedings under the Act, a petition alleging ineffective assistance of counsel may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010). If we may dispose of defendant's claim on the basis that he suffered no prejudice, we need not address whether counsel's performance was objectively unreasonable. *People v. Salas*, 2011 IL App (1st) 091880, ¶ 91.

¶ 28    Claims of ineffective assistance of appellate counsel are governed by the same test used in assessing claims of ineffective assistance of trial counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011). A defendant challenging appellate counsel's effectiveness must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful. *Id.* Appellate counsel need not brief every conceivable issue on appeal and may refrain from developing non-meritorious issues without violating *Strickland*. *People v. Guerrero*, 2018 IL App (2d) 160920, ¶ 43. Therefore, unless the underlying issue is meritorious, a defendant suffers no prejudice if counsel does not raise it on appeal. *People v. Childress*, 191 Ill. 2d 168, 175 (2000).

¶ 29    In order to assess the merit of defendant's argument, we must determine whether a challenge to the sufficiency of the evidence would have been successful had it been raised on direct appeal.

¶ 30    When a defendant challenges his conviction based upon the sufficiency of the evidence presented against him, we must ask whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. All reasonable inferences from the record must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. It is the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh evidence, and to draw reasonable inferences from the facts. *Brown*, 2013 IL 114196, ¶ 48. A reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses. *Id*. A defendant's conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of his guilt. *Id.*

¶ 31    To prove defendant guilty of first degree murder, the State needed to prove beyond a reasonable doubt that, in performing the acts that caused the death of an individual, defendant "either intend[ed] to kill or do great bodily harm to that individual or another, or [knew] that such acts will cause death to that individual or another." 720 ILCS 5/9-1(a)(1) (West 2008). To prove attempt armed robbery, the State was required to prove that with intent to commit an armed robbery, defendant took a substantial step toward the commission of that offense. 720 ILCS 5/8-4(a) (West 2008); 720 ILCS 5/18-2(a)(4) (West 2008)); *People v. Toy*, 407 Ill. App. 3d 272, 289-90 (2011). Here, defendant contests only his identification as the shooter.

¶ 32    After viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found beyond a reasonable doubt that defendant committed the offenses at issue when an eyewitness identified defendant as the person who emerged from Sanders's vehicle following the shooting, defendant's fingerprints were recovered from Sanders's vehicle, and defendant told police that he may have been in the area the day and time of the shooting and that it was not "cold-blooded."

¶ 33    While defendant notes that his experts challenged the State's fingerprint evidence, and claims Erickson's testimony regarding the inculpatory statement was uncorroborated, his arguments are, essentially, a request to reweigh the evidence presented at trial in his favor and substitute our judgment for that of the trier of fact. This we cannot do. See *People v. Abdullah*, 220 Ill. App. 3d 687, 693 (1991) ("A reviewing court has neither the duty nor the privilege to substitute its judgment for that of the trier of fact."). It is the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh evidence, and to draw reasonable inferences therefrom. *Brown*, 2013 IL 114196, ¶ 48. In doing so, the trier of fact is not required to disregard the inferences that flow from the evidence or search out all possible explanations consistent with a defendant's innocence and raise them to a level of reasonable doubt. *People v. Newton*, 2018 IL 122958, ¶ 24. Moreover, contrary to defendant's argument, we cannot say that the identification of defendant by Binns was so improbable or unsatisfactory that a reasonable doubt existed as to defendant's guilt.

¶ 34    It is well settled that the testimony of one identification witness, if positive and credible, is sufficient to sustain a conviction. *People v. Herron*, 2012 IL App (1st) 090663, ¶ 15; *People v. Slim*, 127 Ill. 2d 302, 307 (1989). When assessing identification testimony, we rely upon the factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972).

> "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at

the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199-200.

¶ 35    When considering the *Biggers* factors in relation to Binns's identification of defendant as the person he saw exit Sanders's vehicle after the shooting, we conclude that these factors weigh in the State's favor.

¶ 36    First, the record demonstrates that Binns had the opportunity to view defendant at the time of the shooting. Binns testified that it was the morning and that as he looked through the window to check on his car, he saw a man in a grey hoody or sweater open the passenger door of Sanders's vehicle and get inside. Nothing blocked his view, and Binns later saw defendant's face as defendant walked past the currency exchange. Although Binns acknowledged that the entire incident only took two to three minutes, and that he only saw defendant's face for part of that time, we are not persuaded by defendant's argument that the brief nature of the encounter was fatal to Binns's identification. See *People v. Barnes*, 364 Ill. App. 3d 888, 894 (2006) ("an encounter as abbreviated as 'five to ten seconds' *** [is] sufficient to support a conviction" (quoting *People v. Parks*, 50 Ill. App. 3d 929, 930 (1977))). Thus, the first *Biggers* factor weighs in favor of Binns's identification of defendant as the person who exited Sanders's vehicle.

¶ 37    The second factor, the degree of attention of the witnesses, also weighs in favor of a reliable identification. Binns testified that he looked into the parking lot to check on his car, and that he was concerned for his personal safety following the shooting and watched defendant closely to ensure that defendant did not use a weapon against him. These facts support an inference that Binns paid attention to the shooter and where he was going. To the extent that defendant relies on law review articles to argue that a witness's "stress during a crime can

diminish" the ability to make an identification, this research was not presented to the trial court and will not be considered on appeal. See *People v. Heaton*, 266 Ill. App 3d 469, 477 (1994) ("Judicial notice cannot be extended to permit the introduction of new factual evidence not presented to the trial court"); *People v. Mehlberg*, 249 Ill. App. 3d 499, 531-32 (1993) (citations to research studies on appeal constituted "an attempt to interject expert-opinion evidence into the record" that was not subject to cross-examination by the State or considered by the trial court). Rather, the record establishes that Binns was cross-examined regarding the amount of time that he was able to observe the shooter and the amount of attention he paid to the shooter.

¶ 38    We are not persuaded by defendant's argument regarding the third factor, the accuracy of a witness's prior description of the offender. Defendant argues that Binns testified that the shooter weighed 135 to 145 pounds on the date of the incident, but notes that his presentence investigation report (PSI) stated that he weighed 185 pounds. Initially, we are not persuaded that Binns's testimony regarding defendant's weight, in and of itself, constitutes a prior identification. Moreover, the shooting occurred in 2009, and defendant's PSI was created in 2013. It is not incredible to believe that defendant's weight changed in the intervening four years.

¶ 39    Finally, the last two *Biggers* factors, the level of certainty demonstrated by the witness at the identification confrontation and the length of time between the crime and the identification confrontation, further support the reliability of Binns's identification of defendant. Binns spoke to police the day of the shooting and identified defendant in a lineup 18 days later. This court has found that significantly greater lengths of time have not rendered identifications unreliable. See *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36 (16-month delay between crime and positive

identification). Additionally, Binns identified defendant at trial as the person whom he saw exit Sanders's vehicle. *People v. Magee*, 374 Ill. App. 3d 1024, 1032-33 (2007) (a witness's identification was reliable when, in pertinent part, it was made without hesitation). Accordingly, we cannot say that Binns's identification of defendant was so unreliable that there exists a reasonable doubt as to defendant's guilt. *Brown*, 2013 IL 114196, ¶ 48.

¶ 40 Accordingly, because a challenge to the sufficiency of the evidence would not have succeeded on direct appeal, defendant has failed to establish prejudice. See *Childress*, 191 Ill. 2d at 175 (unless the underlying issue is meritorious, a defendant suffers no prejudice if appellate counsel does not raise it on direct appeal). Therefore, as defendant's *pro se* postconviction petition failed to establish that he was arguably denied the effective assistance of appellate counsel (*Petrenko*, 237 Ill. 2d at 497), the circuit court properly summarily dismissed it as frivolous and patently without merit.

¶ 41 For the forgoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 42 Affirmed.