2020 IL App (1st) 17-2153-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
June 2, 2020

No. 1-17-2153

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the Circuit Court of |
| Respondent-Appellee, | ) | Cook County, Illinois, |
| | ) | Criminal Division. |
| v. | ) | |
| | ) | No. 02 CR 13745 |
| ERIC PERRY, | ) | |
| | ) | The Honorable |
| Petitioner-Appellant. | ) | Vincent M. Gaughan, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's finding after a third-stage postconviction evidentiary hearing that the petitioner failed to establish his trial counsel's ineffectiveness on the basis of counsel's failure to call alibi witnesses was not against the manifest weight of the evidence.

¶ 2    Following a bench trial in the circuit court of Cook county, the petitioner, Eric Perry, was found guilty of first-degree murder and sentenced to 49 years' imprisonment.  On direct appeal, we affirmed the petitioner's conviction, but determined that the evidence was insufficient to sustain the 25-year firearm sentencing enhancement for the personal discharge of a weapon, and therefore, reduced that enhancement to 20 years, for an aggregate term of 44 years in prison.

*People v. Perry*, No. 1-05-0480 (2007) (unpublished order pursuant to Supreme Court Rule 23) (hereinafter *Perry I*). The petitioner subsequently filed a *pro se* postconviction petition alleging ineffective assistance of trial counsel based on counsel's failure to investigate and present alibi witnesses at his trial. After the trial court dismissed that petition, we reversed and remanded concluding that the petitioner had made a substantial showing of ineffective assistance of counsel. See *People v. Perry*, 2013 IL App (1st) 111650-U (hereinafter *Perry II*). The matter proceeded to a third stage postconviction evidentiary hearing, after which the trial court denied the petition, concluding that the petitioner had failed to establish by a preponderance of the evidence that counsel had provided him with ineffective assistance. The petitioner now appeals contending that the trial court's determination was against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 3                                    I.  BACKGROUND

¶ 4        The underlying facts of this case are set forth at length in our orders from the petitioner's direct appeal of his conviction (*Perry I*, No. 1-05-0480 (2007) (unpublished order pursuant Supreme Court Rule 23)), and his appeal from the second-stage dismissal of his postconviction petition (*Perry II*, 2013 IL App (1st) 111650-U). We therefore restate only those facts necessary to the resolution of the issues raised here.

¶ 5        During the petitioner's bench trial, the State presented the testimony of two eyewitnesses. John Johnson first testified that sometime after 10 p.m. on April 29, 2002, he and the victim, Donald Dunlap, drove separate vans to pick up Johnson's friend, Erica Alexander, at her house on Gladys Street. Both men double parked on the one-way street in front of Alexander's residence, and Johnson exited his van to talk with the victim, while they waited for Alexander. During their conversation, a blue Chevrolet Caprice, driven by the petitioner, came down the

2

street. Johnson moved in front of the victim's van to let the car pass. The petitioner honked and slowed down a bit, but nonetheless hit both vans as he passed. According to Johnson, the petitioner then exited his car, verbally accosted the men because they had double-parked, and told them that he was carrying a "big a** pistol," before returning to his car and driving away.

¶ 6    Johnson testified that once Alexander came down from her house, he drove off with her, while the victim followed in his own van. Approximately two blocks away, however, the brakes on Johnson's van malfunctioned, and he was forced to stop. Johnson and the victim pulled over their respective vans and parked on opposite sides of the street. While Johnson searched the back of his van for vise grips, the victim exited his van, walked across the street to the passenger side of Johnson's van, and began talking with Alexander. According to Johnson, at this point, a maroon car pulled up and the trunk opened. Johnson heard shots and saw fire coming out of the trunk. Johnson climbed through the inside of his van and hid under a couch located in the back, as he heard more gunshots.

¶ 7    Watching from the back passenger-side window of his van, Johnson observed the petitioner walk past the van with a gun in his hand and fire a couple more shots at the ground. Although Johnson could see the petitioner from the waist up, he could not see what the petitioner was shooting at. Johnson continued to watch as the petitioner walked back toward the maroon car but did not see him getting into that car before it sped off. When Johnson exited his van, he saw the victim lying on the ground at the exact spot where the petitioner had shot just moments ago. Johnson later identified the petitioner as the shooter both in a photo array, and subsequently in a lineup arranged by the police.

¶ 8    For her part, Alexander testified that she heard a noise while Johnson's van was double

parked in front of her residence but saw neither an automobile collision nor the ensuing argument between the petitioner, Johnson, and the victim. She recalled that, after the van stopped due to faulty brakes and Johnson went to fix it, she heard gunshots and dropped to the floor of the van, holding her head. She testified that she did not see who fired the shots or what Johnson and the victim were doing at the time the shots were fired. She further stated that it sounded like the shots were coming from more than one gun. When the shooting stopped, Alexander returned to her seat, and saw a maroon car driving away from the scene.

¶ 9      Alexander acknowledged that about an hour after the incident, she spoke with the police and told them that she did not know who the shooter was.

¶ 10      Alexander, however, admitted that on the following morning, she identified the petitioner in a lineup at the police station.  She also acknowledged that the police took a handwritten statement from her in which she attested that she saw the petitioner fire a gun at the victim from inside Johnson's van, but that she did not initially identify him to the police because she was afraid that the petitioner would kill her. Alexander identified her signature on the written statement and on the photograph of the petitioner.

¶ 11      Alexander also acknowledged that she testified before a grand jury about two weeks after the shooting. In her grand jury testimony, Alexander related that when the shooting stopped, she looked up and saw the petitioner holding a gun.  She also told the grand jury that she initially refused to tell the police that the petitioner was the shooter because she was afraid that the petitioner would kill her if she identified him.

¶ 12      On cross-examination, however, Alexander maintained that she never saw who fired the shots or where they came from. Instead, she claimed that she identified the petitioner in the lineup only because she was scared and confused, and that she signed the handwritten statement

because she was under a lot of stress. Alexander explained that on the morning after the shooting, the police escorted her to the police station, placed her in a locked room and would not permit her to leave. According to Alexander, four or five police officers kept coming into the room, "hollered" and cursed at her, and threatened that she would be sent to jail if she did not cooperate by signing a prepared statement and testifying before the grand jury. Alexander averred that she did not sign the statement until 4 a.m. on May 2, 2002, three days after the shooting. In addition, she stated that on the day of her grand jury testimony three or four detectives came to her house, picked her up, drove her to the courthouse and told her what to say.

¶ 13     Two detectives subsequently testified that Alexander was treated properly during the police investigation and denied all her claims of coercion. However, both detectives acknowledged that Alexander signed her statement at approximately 4 a.m. on May 2, 2002, and that they personally escorted her to the grand jury hearing.

¶ 14     The parties stipulated that a firearm expert would testify that two bullets recovered from the victim's body were fired from two different guns. Based on this, the expert concluded that at least one other gun was fired at the scene and that it was impossible to rule out that more than three guns were fired.

¶ 15     After hearing the evidence, the trial court found the petitioner guilty of first-degree murder. The court determined that Alexander's handwritten statement, as well as her statement before the grand jury, were "voluntary." In addition, the court found that during the commission of the offense, the petitioner had personally discharged a firearm that proximately caused the victim's death. The court sentenced the petitioner to a total of 49 years in prison, 24 years for first-degree murder and an additional 25 years for personally discharging the firearm that killed the victim.

¶ 16     On appeal, we affirmed the petitioner's conviction but reduced his sentencing enhancement

from 25 to 20 years, for an aggregate sentence of 44 years' imprisonment. *Perry I,* No. 1-05-0480 (2007) (unpublished order pursuant to Supreme Court Rule 23).

¶ 17    On March 24, 2008, the petitioner filed a *pro se* postconviction petition. After counsel was appointed to represent him, the petitioner filed a supplemental petition, arguing, *inter alia*, that trial counsel had provided him with ineffective assistance because he failed to present two alibi witnesses who had already been subpoenaed. The petitioner argued that the failure to call these witnesses deprived him of the opportunity to rebut the State's theory at trial that he was the shooter. In support, the petitioner attached affidavits from Clarence Cooper and Shamika Benson.

¶ 18    In his affidavit, Cooper stated that he was one of three passengers in the car that the petitioner was driving when he hit the two double-parked vans. According to Cooper, the petitioner stopped and admitted the accident was his fault, and the man standing next to the vans said, "It ain't nothing, I'm cool." The group drove off, went to a store, and then proceeded to a house on the 3900 block of Van Buren Street, where they hung out on a porch with a larger group, drinking and celebrating a friend's birthday. Around 11:30 p.m., Cooper, the petitioner, and two other friends decided to sit in a car and listen to the radio. Detectives arrived on the scene and took them to the police station. After several hours, Cooper and the others were released. However, shortly thereafter, Cooper, the petitioner, and two other men were pulled over on the highway and rearrested.

¶ 19    Cooper further attested that after he participated in a lineup, the police tried "to get him to sign a paper" saying he saw the petitioner shoot someone. Cooper averred, however, that he knew that the petitioner did not shoot anyone "because we were together the whole day, even after we got picked up a second time." Cooper stated that he was released a couple of days later.

He was subsequently subpoenaed, and was present at the petitioner's trial, and told petitioner's attorney that he wanted to testify on the petitioner's behalf but was never called.

¶ 20    In her affidavit, Benson stated that at the time of the shooting, the petitioner was at her house at 3928 West Van Buren Street, "amongst a lot of people." Benson stated that she was subpoenaed and was present at the petitioner's trial, but that the defense attorney did not let her testify on the petitioner's behalf.

¶ 21    The trial court dismissed the petition finding that the petitioner had not made a substantial showing of ineffective assistance of counsel. On appeal, we reversed and remanded concluding that the petitioner was entitled to an evidentiary hearing on his claim that trial counsel was ineffective for failing to call the two alibi witnesses. See *Perry II*, 2013 IL App (1st) 111650-U, ¶¶ 19-24. In doing so, we noted that although generally an attorney's decisions regarding which witnesses to call are matters of trial strategy, counsel may nonetheless be deemed ineffective if he fails to present exculpatory evidence of which he is aware, such as, the testimony of a witness who would support an otherwise uncorroborated defense. *Id*. at ¶ 19. We held that because in the instant case, the defense theory at trial had been that the petitioner was misidentified because Johnson could not see the shooter from his vantage point under a couch in the back of his van, and because his testimony that the petitioner shot the victim at close range conflicted with the medical examiner's findings, the proposed alibi witnesses would necessarily have corroborated that defense theory. *Id*. at ¶ 20. We further found that the record did not affirmatively disclose any strategic reason for not calling the alibi witnesses. *Id*. at ¶ 24. We therefore concluded that even though "counsel's decision not to call [the two alibi witnesses] may very well have been a professionally reasonable tactical decision and not incompetence," the record did not "reflect the nature of" counsel's decision, "one way or the other," and an evidentiary hearing was necessary

to permit the trial court to "make an informed decision as to whether petitioner received ineffective assistance of counsel." *Id.*

¶ 22     On remand, in July 2015, the parties proceeded with an evidentiary hearing. Before any evidence was presented, however, defense counsel indicated that Benson could not be located, but that Cooper remained willing to testify. In addition, counsel informed the court that he had three new alibi witnesses (Miko Meriday, Johnny Harris and Marteze Dixon), who were all prepared to testify about the petitioner's location at the time of the shooting. The State objected to the introduction of the additional alibi witnesses, contending that it had not been provided with affidavits from any new witnesses and that under the appellate court's mandate the trial court was limited to conducting an evidentiary hearing solely with respect to counsel's ineffectiveness for failing to call Benson and Cooper. The trial court requested that the parties submit legal memoranda explaining whether under the appellate court's mandate it could consider the testimony of the additional alibi witnesses. After the parties submitted their arguments, the trial court sustained the petitioner's motion and expanded the evidentiary hearing to include the testimony of all available alibi witnesses. Because she could not be located, Benson did not testify at the hearing. Instead, the defense presented the testimony of Cooper, Meriday, Harris and Dixon.

¶ 23     Cooper first testified that on the night in question sometime between 9 p.m. and 10 p.m., he and Meriday, were in a blue Chevrolet Caprice driven by the petitioner, when they scraped two double-parked vans on Gladys Street. Cooper averred that the petitioner exited his car and "had a couple of words with the guys," who owned the vans. Cooper had never met these men before. According to Cooper, the petitioner was not angry about the accident because it was only a scrape. He did not believe that anyone was upset about it. As Cooper explained:

8

"One of the guys, he tried to make an argument, and one guy was—he was holding him back like, no, you know, it's nothing but a scrape. So, you know, it's nothing. The situation was squashed right there. The guy said something. I don't know what he said as we were pulling off, and [the petitioner] told [Alexander] like, why don't you tell your guys, man, chill out; you know who I am."

In addition, Cooper denied that the petitioner had a gun, or that he told the men that he was armed.

¶ 24    Cooper next testified that after the petitioner came back into the vehicle, he drove them to a nearby liquor store, where they briefly spoke to a friend, Sabrina Askew. The petitioner, Cooper and Meriday then drove towards Jackson Boulevard and Central Park Avenue and "pulled up on a couple more of our guys." Afterwards, they drove to the corner of Van Buren Street and Pulaski Road, parked in a vacant lot, and started drinking.

¶ 25    Cooper testified that there was a party happening on the 3900 block of Van Buren Street. As they sat in the car, Askew walked up to them and they talked and shared a drink. At some point, the petitioner exited the car and walked over to Benson's house, which was three houses over from the vacant lot. About five to ten minutes later, Cooper heard gunshots. Cooper acknowledged that the petitioner was not with him when he heard the shots but claimed that he was at Benson's house. Cooper denied observing the petitioner leaving Benson's house or entering a red vehicle. Cooper admitted that after the petitioner left, he did not see him for the rest of the evening and eventually went home.

¶ 26    Cooper acknowledged that he was arrested together with Meriday, Harris, Dixon and the

petitioner on the following day. He stated that the police held him for three and a half days, during which he was interviewed "probably 50 times." Cooper told the police what he observed that night and signed a statement that was not inculpatory before being released.

¶ 27    Cooper acknowledged that prior to trial an investigator sent by the petitioner's trial counsel interviewed him about the case. Cooper also testified that he met with the petitioner's trial counsel in the courtroom hallway prior to trial. Cooper was with Meriday, Dixon, Harris, Tenesha Palmer, Michelle Bell, Sheldon Bell, and the petitioner's mother. According to Cooper, defense counsel asked him what happened on the night of the shooting, and Cooper told him everything he just testified to at the hearing. Counsel then told Cooper that he was going to be a witness at trial, but Cooper was never subpoenaed.

¶ 28    On cross-examination, Cooper acknowledged that he has known the petitioner all his life. Cooper also admitted that he never actually saw the petitioner enter Benson's house, and instead just observed him walking towards it and standing on the sidewalk in front.

¶ 29    Cooper further acknowledged that in his written and signed statement to police he said that the petitioner got out of the car on Van Buren Street between 10:45 and 10:50 p.m., and that Cooper did not see him again until sometime between 11:15 and 11:20 p.m. Cooper averred, however, that he could not recall ever making these statements to the police.

¶ 30    Meriday next testified consistently with Cooper. He stated that on the night in question, he owned a blue Chevrolet Caprice, and was driving around the neighborhood with the petitioner, Cooper, and Harris. The petitioner was driving and Meriday was in the front passenger seat, while Cooper and Harris were in the back. As they drove down Gladys Street toward Pulaski Road, the petitioner tried to drive around a double-parked van, but his passenger rear mirror scraped the side of the van. After the accident, all four men exited the vehicle and the petitioner

10

spoke to the van's owner, stating "I blew the horn for you to pull over. That's why I was blowing the horn because it wasn't enough room." According to Meriday, however, no one was angry, and the van owner said, "It's nothing but a scratch. It's alright."

¶ 31      After the accident, the four men drove on to Jackson Avenue and Pulaski Road to "holler at our friend Sabrina [Askew]," after which they proceeded to Van Buren Street and Pulaski Road and parked in a vacant lot. They "hung out" at the lot, drinking and talking, until the petitioner said he was "fittin' to run and holler at [Benson] real quick" and walked off the lot towards Dixon's house. Meriday stated that he did not see the petitioner go into the house because he could not see the house from the lot. He also averred, however, that he did not see the petitioner leave the house, or a red car pick him up. Meriday further denied that the petitioner had a gun that night.

¶ 32      Consistent with Cooper, Meriday also testified that he spoke to the petitioner's trial counsel in the courtroom hallway prior to trial and told him what had transpired on April 29, 2002.

¶ 33      On cross-examination, Meriday acknowledged that the following morning he was arrested together with Cooper, Harris, Dixon, and the petitioner, and after three days eventually gave a statement to police. Meriday acknowledged that according to this statement he told the police that at about 10:45 p.m., the petitioner exited the car, and was gone for about 30 to 45 minutes. Meriday did not know where the petitioner went during this time. Meriday averred, however, that he never told the police this, and that he signed the statement "before even reading it" because the police promised him that he would be released.

¶ 34      Harris, who was incarcerated at the time of the evidentiary hearing[1], next testified that on

---

[1] Harris was serving time for two convictions of manufacture and delivery of a controlled substance from 2014.

11

April 29, 2002, he was 17-years old and lived on the second floor of 3929 West Van Buren Street. Benson, who was dating the petitioner, lived on the first floor of the same building. April 29 was Harris's birthday, so he spent the evening outside on the building's front porch with several people, including the petitioner. Harris averred that he was with the petitioner from about 7 p.m. to 11:30 p.m. He denied that the petitioner ever left in a red vehicle or that he was armed. Harris testified that he did not recall any gunshots because there were "fireworks" and "gunshots" in that neighborhood all of the time. At 11:30 p.m. Harris left with his girlfriend to go to the Shamrock hotel, on Cicero Avenue and Roosevelt Road. He was arrested together with Meriday, Cooper, Dixon, and the petitioner on the following morning.

¶ 35    On cross-examination, Harris could not recall whether he spoke to the petitioner's trial counsel before trial. He testified that more recently he signed an affidavit on July 21, 2015, after speaking with the petitioner's current new counsel. Harris acknowledged that this affidavit did not state what time he was with the petitioner on April 29, 2002. In addition, he admitted that contrary to his direct testimony, in that affidavit he had attested that he was with the petitioner when they heard gunshots.

¶ 36    Dixon next testified that on April 29, 2002, he lived with Benson, who is his sister, at 3929 West Van Buren Street. That night, as he was drinking with a few neighbors in the vacant lot about two houses away, he saw the petitioner walk towards their house. Dixon acknowledged that he only saw the petitioner walk past him and did not actually see him entering the building. Dixon denied that the petitioner was armed or that he was picked up by a red car that night.

¶ 37    On the following morning, Dixon was arrested together with the petitioner, Meriday, Harris, and Cooper. Dixon was taken into custody and remained at the police station for 72 hours, where he was questioned about the petitioner's and Meriday's whereabouts on the night of the

shooting and gave a written statement to the police. Dixon testified that he did not recall whether he ever spoke to the petitioner's trial counsel about April 29, but averred that trial counsel had called him and told him that "if they really needed us, they will contact us."

¶ 38    On cross-examination, Dixon acknowledged that in his written and signed statement to the police, he said that after the petitioner spent some time with his sister, he dropped the petitioner off at the Delano playground at about 10 p.m. and then did not see him for about an hour to an hour and a half. Dixon denied telling this to the police, and instead claimed that he signed the statement without reading it because he was tired, hungry and "ready to go home."

¶ 39    After the defense rested, the State called the petitioner's trial counsel, LaFarrell Moffett. Moffett had worked for the Public Defender's Office for nearly 20 years, and for the Murder Task force for five. Moffett testified that after being assigned to the case, he met with the petitioner on numerous occasions in Cook county jail and discussed with him at length the charges, the possible penalties, and the discovery materials as they became available from the State. He also spoke to the petitioner about possible witnesses. During one jail visit, the petitioner provided Moffett with a written list of individuals he had identified as alibi witnesses. Moffett explained that all but one of these witnesses appeared in the police reports that he received as part of discovery from the State. In addition to the police reports, Moffett received written statements from Cooper, Harris, Dixon and Meriday. In Moffett's opinion, all the witnesses were unreliable because they "had already given two or three conflicting inconsistent statements" to police and "each witness further contradicted the other witnesses."

¶ 40    Moffett testified that he had his long-time investigator, Mary Clements, research the alibi witnesses. As part of this process, among other things, Moffett gave Clements the petitioner's list of potential alibi witnesses. Although he did not recall specific conversations with Clements,

he testified that he was in "regular and constant communication with [her] about all of his cases." After receiving a written report from Clements, which indicated that she had interviewed all the witnesses and found them not to be viable, Moffett discussed the witnesses with the petitioner. Moffett informed the petitioner that a better trial strategy would be to argue lack of proof beyond a reasonable doubt without introducing any alibi witnesses. As Moffett explained:

> "I told [the petitioner] what I have said here today. The witnesses that he had provided were contradictory, that they did not provide an alibi, that they came with prior inconsistent statements, and even if any one witness [was] taken at full face value [they] only placed him three to seven minutes by car away from the homicide scene at any given time, that didn't amount to an alibi if you believed any one witness."

According to Moffett, the petitioner never objected to this trial strategy.

¶ 41    On cross-examination, Moffett acknowledged that he personally never interviewed Cooper, Meriday, Harris, or Dixon.

¶ 42    The parties next stipulated that if called to testify, Assistant State's Attorney (ASA) James Novy, would state that together with Chicago Police Detective Hennigan, on May 2, 2002, he separately interviewed Cooper, Meriday, and Dixon, and prepared separate handwritten statements, containing a summary, not a verbatim account, of what each witness told them about the shooting. ASA Novy would further testify that each witness could review his own statement and make any corrections prior to signing it. The three statements were then entered into evidence.

¶ 43    After the State rested, the hearing was continued to July 24, 2017, for arguments by the parties. On August 11, 2017, the trial court denied postconviction relief finding that there was no ineffective assistance of counsel. The court did not issue a written order, but stated:

14

"Things that impressed me quite a bit was that there was --Mr. Moffett made ten different jail visits to see [the petitioner]. He interviewed witnesses. He also discussed with [the petitioner] *** the fact that he wasn't going to be calling alibi witnesses, and my notes say that [the petitioner] never disagreed with that trial strategy.

Looking at the totality of the facts and the circumstances under which it was made, and then the gaps in what would be considered an alibi, I find that under both prongs of *Strickland*, neither one of these prongs have been met."

The petitioner now appeals.

¶ 44                                II.  ANALYSIS

¶ 45      On appeal, the petitioner contends that the trial court's denial of his postconviction claim of ineffective assistance of trial counsel was manifestly erroneous where counsel failed to adequately explain his reasons for not calling the four alibi witnesses, who would have strengthened the petitioner's theory of misidentification.  For the following reasons, we disagree.

¶ 46      The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2014)) provides a three-step process by which a convicted defendant may assert a substantial denial of his or her constitutional rights in the proceedings that led to the conviction. *People v. Edwards*, 2012 IL 111711, ¶ 21; *People v. Tate*, 2012 IL 112214, ¶ 8; see also *People v. Walker*, 2015 IL App (1st) 130530, ¶ 11 (citing *People v. Harris*, 224 Ill. 2d 115, 124 (2007)).  At the first stage of postconviction proceedings, the trial court has 90 days to review the petition and may summarily dismiss it if it finds that the petition is frivolous and patently without merit, *i.e.*, it has no arguable basis either in law or in fact.  *Tate*, 2012 IL 112214, ¶ 9; *People v. Williams*, 2017 IL App (1st) 152021, ¶ 20; *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006); 725 ILCS 5/122-2.1(a)(2) (West 2014).  If the petition is not summarily dismissed, it proceeds to the second

stage, where counsel may be appointed to an indigent petitioner, and the State may move to dismiss the petition following any amendments. *People v. Domagala*, 2013 IL 113688, ¶ 33; *Pendleton*, 223 Ill. 2d at 472; 725 ILCS 5/122-5 (West 2014). During the second stage, the petitioner "bears the burden of making a substantial showing of a constitutional violation." *Pendleton*, 223 Ill. 2d at 473. Dismissal at the second stage is warranted only where the petition's allegations of fact, liberally construed in favor of the petitioner, and in light of the original trial record, fail to make a substantial showing of a constitutional violation. *Williams*, 2017 IL App (1st) 152021, ¶ 21; *People v. Coleman*, 183 Ill. 2d 366, 382 (1998). Because the second stage tests the legal sufficiency of the petition, at this stage, the trial court does not engage in any fact finding or credibility determinations, and all well-pleaded allegations in the petition must be taken as true unless affirmatively refuted by the record. *Domagala*, 2013 IL 113688, ¶ 35. If the petition is not dismissed, the proceedings move to the third stage, where an evidentiary hearing is held. *Pendleton*, 223 Ill. 2d at 472-73; 725 ILCS 5/122-6 (West 2014).

¶ 47    At the third stage of postconviction proceedings, such as the one here, the petitioner bears the burden of showing by a preponderance of the evidence a substantial violation of his constitutional rights. *People v. Coleman*, 2013 IL 113307, ¶ 92. During the evidentiary hearing, the trial court has wide discretion in deciding what evidence to consider (*People v. Coleman*, 206 Ill. 2d 261, 278 (2002)) and "may receive proof by affidavits, depositions, oral testimony or other evidence" (725 ILCS 5/122-6 (West 2014)). Furthermore, during the evidentiary hearing, the trial court acts as the fact finder and is therefore responsible for resolving conflicts in the evidence and determining the credibility of witnesses and the weight to be given particular testimony. *Domagala*, 2013 IL 113688, ¶ 34. Accordingly, our review of the trial court's decision following an evidentiary hearing is for manifest weight of the evidence.

16

*Pendleton*, 223 Ill. 2d at 473. We may find a ruling to be against the manifest weight only where the error is clearly evident, plain, and indisputable. *People v. Hughes*, 329 Ill. App. 3d 322, 325.

¶ 48    In the present case, the petitioner argues that he presented sufficient evidence of his trial counsel's ineffectiveness at the evidentiary hearing so as to be entitled to postconviction relief. It is well settled that claims of ineffective assistance of trial counsel, such as this one, are resolved under the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Lacy*, 407 Ill. App. 3d 442, 456 (2011); see also *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*)).  Under *Strickland*, the petitioner must establish both: (1) that his counsel's conduct fell below an objective standard of reasonableness; and (2) that he was prejudiced as a result of counsel's conduct.  See *Lacy*, 407 Ill. App. 3d at 456; see also *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (citing *Strickland*, 466 U.S. at 687-94)).

¶ 49    Under the first prong of *Strickland*, petitioner must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy "under prevailing social norms." *Colon,* 225 Ill. 2d at 135; *People v. Evans,* 209 Ill. 2d 194, 220 (2004); *Lacy*, 407 Ill. App. 3d at 456-57.  A petitioner may overcome this strong presumption only where " 'counsel's decision appears so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy.' " *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 81 (quoting *People v. King,* 316 Ill. App. 3d 901, 916 (2000)).

¶ 50    Under the second prong of *Strickland*, the petitioner must show that "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Lacy*, 407 Ill. App. 3d at 457; see also *Colon*, 225 Ill. 2d at 135. "[A] reasonable probability that the result would have been different is a probability sufficient to

undermine confidence in the outcome--or put another way, that counsel's deficient performance rendered the result of [the proceedings] unreliable or fundamentally unfair." *Evans*, 209 Ill. 2d at 220; see also *Plummer*, 344 Ill. App. 3d at 1019 (citing *Strickland*, 466 U.S. at 694)).

¶ 51    In the present case, after a full evidentiary hearing, the trial court found that defense counsel investigated all the purported alibi witnesses and made a strategic decision not to call them at trial. The court found defense counsel's decision reasonable in light of the "gaps in what would be considered an alibi" and determined that the petitioner had failed in his burden of establishing either prong of *Strickland*. For the reasons that follow, we find nothing manifestly erroneous in this conclusion.

¶ 52    Our courts have repeatedly held that "[d]ecisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with trial counsel." *Wilborn*, 2011 IL App (1st) 092802, ¶ 79 (citing *People v. Munson*, 206 Ill. 2d 104, 139–40 (2002)). It is well established that these types of decisions are considered matters of trial strategy and are generally immune from claims of ineffective assistance of counsel. *Wilborn*, 2011 IL App (1st) 092802, ¶ 79. It is strategically sound for counsel not to call a witness whose testimony would be of "questionable value" (*People v. Guest*, 166 Ill. 2d 381, 400 (1995)) or whose testimony could potentially harm the defendant's case (*People v. Marshall*, 375 Ill. App. 3d 670, 677 (2007); *People v. Smado*, 322 Ill. App. 3d 329, 335 (2001); *People v. Peterson*, 248 Ill. App. 3d 28, 41 (1993)). Moreover, neither mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have handled the case differently will be sufficient to find the trial lawyer was incompetent. *People v. Vera*, 277 Ill. App. 3d 130, 138 (1995). Accordingly, counsel's decision regarding which witnesses to call at trial will be considered reasonable unless his "strategy [wa]s so unsound that counsel can be said to have entirely failed to conduct any

18

meaningful adversarial testing." *People v. Negron*, 297 Ill. App. 3d 519, 538 (1998) (citing *People v. Reid*, 179 Ill. 2d 297 (1997), and *People v. Madej*, 177 Ill. 2d 116, 148–49 (1997)).

¶ 53    In the present case, we cannot say that defense counsel's decision not to call Cooper, Harris, Meriday or Dixon as alibi witnesses, was outside the realm of sound trial strategy. At the evidentiary hearing, defense counsel testified that he met and spoke with the petitioner in Cook County Jail and that the petitioner provided him with a list of potential alibi witnesses, including Cooper, Harris, Meriday and Dixon. Defense counsel averred that all of the names on that list, save for one, appeared in the police reports and that based on his review of those reports, he determined that none of the witnesses were viable since they had already given conflicting and inconsistent statements to police. Counsel further testified that he hired a trusted investigator to investigate the alibi witnesses, and that after the investigator interviewed all of them, she provided him with a report, indicating that none were viable. Counsel stated that after reviewing the investigator's report, he spoke to the petitioner and explained to him that the best strategy would be to avoid an alibi defense altogether and instead attack the sufficiency of the State's case. Specifically, counsel told the petitioner that the witnesses that he had provided: (1) were contradictory and did not provide an alibi; (2) came with prior inconsistent statements; and (3) even "if any one witness was taken at full face value" and believed, the testimony of each placed the petitioner "only three to seven minutes by car away from the homicide scene at any given time," and therefore did not amount to an alibi.

¶ 54    Where all four purported alibi witnesses were impeached at the evidentiary hearing, and none could account for the petitioner's whereabouts for the entirety of the night, we see no reason for the trial court to have disagreed with defense counsel's assessment of their viability and his strategic decision not to call them at trial. At the evidentiary hearing, Cooper, Meriday, and

Dixon all testified that they could not recall the exact time when the petitioner departed the vacant lot on the 3900 block of Van Buren Street to head to Benson's house but stated that they did not see the petitioner until the next morning. All three, however, admitted that they never saw the petitioner enter Benson's building. Harris similarly averred that although he "hung out" with the petitioner in front of Benson's building, he was unaware of the petitioner's whereabouts after 11:30 p.m.

¶ 55    Cooper, Meriday and Dixon were directly impeached by their prior statements to the police. In his statement, Cooper told the police that the petitioner exited the car between 10:45 or 10:50 p.m., after which Cooper did not see him for about 30 to 45 minutes, until about 11:20 p.m. Meriday similarly told the police that after 10:45 p.m. he did not see the petitioner for about 30 to 45 minutes. Dixon also told the police that after he dropped the petitioner off at Delano playground at about 10 p.m., he did not see him again for about an hour to an hour and a half. Since the shooting occurred sometime after 10 p.m., it is evident from these statements that these three purported alibi witnesses were unaware of the petitioner's whereabouts during a crucial time when the shooting occurred.

¶ 56    While Harris was not impeached with any prior inconsistent statement to police, he acknowledged during the evidentiary hearing that until that very day, he did not tell anyone, orally or in writing (including in his own affidavit in support of the petitioner's postconviction petition), that he was with the petitioner from 7:30 p.m. to 11:30 p.m. on the night in question. In addition, Harris acknowledged that while in his affidavit he had claimed that the petitioner was with him when he heard gunshots, at the hearing he could not recall whether he was with the petitioner or whether he even heard gunshots because there were always gunshots or "fireworks" going on in the neighborhood.

¶ 57 Under this record, we find nothing manifestly erroneous in the trial court's determination that there were "gaps in what would be considered an alibi" and that defense counsel's strategy not to call any of the four witnesses was reasonable.

¶ 58 The petitioner, nonetheless, contends that the trial court's decision was manifestly erroneous because in stating its findings on the record, the trial court mistakenly recalled that defense counsel personally interviewed the witnesses. At the outset, we disagree with the petitioner's characterization of the trial court's recollection. In our view, the trial court's reference to counsel "interview[ing] the witnesses" in the context of his ten visits to the petitioner in jail was a statement about counsel's thoroughness in investigating the case, including having his investigator talk to all of the purported alibi witnesses. Nonetheless, even if the trial court did find that counsel personally interviewed the witnesses, contrary to the petitioner's position, this finding is not against the manifest weight of the evidence. Both Cooper and Meriday testified at the evidentiary hearing that together with Dixon and Harris they spoke to trial counsel in the courtroom hallway prior to trial and provided him with the details of their purported alibi testimony. While it is true that counsel could not recall ever personally interviewing these witnesses, it is the function of the trier of fact, and not the reviewing court, to resolve conflicts in the evidence and determine the credibility of the witnesses and the weight to be given particular testimony. See *Domagala*, 2013 IL 113688, ¶ 34. The trial court could very well have chosen to believe Cooper and Meriday on this point and found that, after having spoken to the alibi witnesses prior to trial, and having already reviewed the police file and the investigator's report, defense counsel reasonably concluded that none of the witnesses could provide the petitioner with an alibi for the time of the shooting.

¶ 59 Moreover, regardless of counsel's strategy, we find that the petitioner has failed in is burden

to establish the second prong of *Strickland*, *i.e.*, that there was a reasonable probability that the outcome of his trial would have been different had Cooper, Harris, Dixon and Meriday testified. Where the State presented evidence of the petitioner's motive to retaliate against the victim, and Johnson positively identified the petitioner as the shooter, both prior to and during trial, the evidence was more than sufficient to find the petitioner guilty. See *In re N.A.*, 2018 IL App (1st) 181332, ¶ 22 (identification by a single eyewitness is sufficient to sustain a conviction where the witness viewed the defendant under circumstances permitting a positive identification). Moreover, while during trial, Alexander recanted her identification of the petitioner as the shooter, she acknowledged that she identified the petitioner both in a written statement to police and in her grand jury testimony and explained her initial reluctance as being motivated by fear of the petitioner. Where the trial court found Alexander's statement to police and at the grand jury to be truthful and voluntary, together with Johnson's identification, the evidence at trial was more than overwhelming.

¶ 60        Under this record, the contradictory, inconsistent and impeached testimony of Cooper, Harris, Dixon and Meriday regarding the petitioner's whereabouts after the accident with the double-parked vans had far more potential to harm than aid the misidentification defense. Where the forensic evidence established that more than one weapon was used to shoot the victim, and where all four witnesses had long-standing ties with the petitioner, and none could conclusively account for the petitioner's whereabouts after he headed to Benson's house, having them testify that the petitioner was within a three-to-seven-minute-driving vicinity of the shooting, had the potential to weaken the petitioner's defense. Accordingly, contrary to the petitioner's position, but for the introduction of Cooper's, Meriday's, Harris's and Dixon's testimony, the outcome of his proceedings would not have been different.

¶ 61                                III. CONCLUSION

¶ 62       For the aforementioned reasons, we find nothing manifestly erroneous in the trial

court's determination that the petitioner failed to establish both prongs of *Strickland*.  We

therefore affirm the judgment of the circuit court.

¶ 63       Affirmed.